Lucian T. **JONES** d/b/a **Seaford Welding Company**, Plaintiff,

v.

**O. A. NEWTON & SON COMPANY**, and **Elmer E. Hasselbring**, Defendants.

**Civ. A. No. 3283.**

United States District Court,
D. Delaware.

Sept. 29, 1970.

C. Walter Mortenson, Wilmington, Del., and Charles A. Weigel, Jr., Washington, D. C., of counsel, for plaintiff.

Brereton Sturtevant of Connolly, Bove & Lodge, Wilmington, Del., and Jackson W. Raysor of Tunnell & Raysor, Georgetown, Del., for O. A. Newton & Son Co.

## OPINION

LATCHUM, District Judge.

This civil action was originally brought on November 15, 1966 by Lucian T. Jones ("Jones") against O. A. Newton & Son Company ("Newton"), Elmer E. Hasselbring ("Hasselbring") and Textron, Inc. ("Textron"). The original complaint consisted of two causes of action. The first cause charged all three defendants with infringement of United States Patent No. 3,061,271 (the "Jones patent") owned by Jones. The second cause sought a recovery from Newton for money due and owing for labor and materials furnished by Jones in erecting certain storage bins and other structures for the Laurel Grain Company as Newton's subcontractor.

On December 7, 1968, Judge Steel of this Court granted Textron's motion for summary judgment against Jones on the ground there was no evidence that Textron either infringed or induced anyone to infringe the Jones patent. Judge Steel also dismissed, *sua sponte*, the second cause of action against Newton for lack of jurisdiction (1) because the cause failed to allege diversity of citizenship and that the amount in controversy exceeded $10,000 and (2) because there was no basis for pendent jurisdiction. Jones, however, was granted leave to amend.

Jones filed an amended complaint on January 16, 1969 against Newton and Hasselbring. The first cause of action again charged both defendants with infringement of the Jones patent. The second count alleged that Newton was guilty of unfair competiton in that it engaged in a deliberate course of conduct designed to drive Jones out of the tank erection business.

Hasselbring, named as a defendant in the original and amended complaint, was never served with process and hence did not appear as a party in this action. The amended complaint seeks an injunction

against further infringement and treble damages from Newton.

Newton denied the charge of infringement on the ground that the Jones patent was so limited in scope by the prior art and by representations made during the course of its prosecution in the United States Patent Office that none of its claims have been infringed and further denied that it was guilty of any acts of unfair competition. Two counterclaims are involved, the first seeks a declaratory judgment that the Jones patent is not infringed and thus unenforceable against Newton, and the second seeks an injunction restraining Jones from unlawfully threatening Newton's customers and subcontractors.

Jurisdiction exists by virtue of 28 U.S.C. § 1338(a) and (b).

Following a trial to the Court, the issues were thoroughly and exhaustively briefed by counsel and the case is now ripe for decision.

## THE PATENT ISSUE

The Jones patent (entitled "Rigging Structure For Erecting Storage Enclosures") was issued to Jones on October 30, 1962. Jones has remained the sole owner of the patent since that date. The patent is in the general field of lifting devices and specifically claims a rigging structure for erecting storage tanks. ("Jones rig"). The storage tanks comprise plural arcuate sections, which are bolted together horizontally to form rings and the rings are then bolted together vertically to form the storage tank walls. In effect, the tanks are erected from the top down since the top ring section forming the upper periphery of the tank and its roof cover are first assembled at ground level and then raised by the Jones rig to a sufficient height so that the adjacent lower ring section may be assembled and joined to the next upper ring section at ground level. This procedure is repeated by adding additional ring sections until the bottommost ring section is attached to complete the tank.

The Jones rig includes a central column, which utilizes fixed and slidable sheave blocks and pulleys to convert a single vertically applied force into plural radial tensioning forces. These radial forces apply equal pulls to each of a number of cables extending radially from the central column to respective vertical supports which are maintained at radially spaced positions from the central column. These supports, positioned at respective positions along the inner wall of the tank, change the direction of the applied force to permit the lifting of the assembled ring sections. In this manner the assembled ring sections are raised equally and uniformly to permit the assembly of successive lower ring sections by individuals working at ground level.

The Jones rig is defined by three separate claims of which claim 1 is representative.[1] It reads as follows:

"1. A rigging structure for erecting storage tanks from assembled ring sections comprising a central column adapted to be positioned with the assembled ring section surrounding same, guideways in said central column, upper and lower sheave blocks mounted within said central column, the upper one of said sheave blocks vertically slidable in said guideways, radially positioned supporting bars secured to the top of the central column, pulleys mounted on the top of the central column, in alignment with the radially positioned supporting bars, vertically disposed columns secured at the outer ends of said radially positioned supporting bars to support the same, pulleys mounted on said columns, hoist lines extending over said pulleys and said supporting bars connected to one of said sheave blocks and the assembled ring section, and a rope threaded through said sheave blocks for raising the assembled ring section."

---

1. Both parties, using claim 1 as typical for purposes of argument, have conceded that it is representative of all three claims of the Jones patent.

Jones actually used a rig of the type covered by his patent to erect storage enclosures on a job at Hebron, Maryland in 1960.

Jones' allegations of infringement of his patent by Newton were limited at trial to one rigging device (the "Hasselbring rig") and its use in 1966 on four different jobs to construct a total of eleven [2] storage tanks in Delaware and Maryland.

Hasselbring was first approached in early April, 1966 by his father-in-law, Harvey V. Beauchamp, a Newton salesman, who asked Hasselbring to perform the subcontract work necessary to erect two grain storage tanks 48 feet in diameter and allied structures for Caper Acres, Inc. at Salisbury, Maryland. Hasselbring agreed and signed a subcontract with Newton to erect the Caper Acres tanks on April 6, 1966. Hasselbring had been in the steel and tank erection business since 1952 and he recognized that the only feasible way to erect the large 48 feet diameter tanks was by the use of a power rig. He drew up the design for his power lifting device in one evening and built it at a cost of about $2000.00 in two weeks time. The basic idea for his rig came from his familiarity with oil derricks. He testified that his lifting device is in effect a miniature oil derrick which pulls from twelve points rather than one point. Hasselbring knew only that Jones had "a power rig without comealongs" before he designed and built his rig. He did not see the Jones rig until after his had been built.

The Hasselbring rig differs from the structures claimed in all three of the claims of the Jones patent in the following principal respects:

1. In the center column the *lower* sheave block is vertically movable and the upper one is stationary.

2. The Hasselbring rig has no element which functions as a guideway for the movable lower sheave block.

3. The vertically disposed A-frames do not support any radially positioned supporting bars emanating from the central column.

4. The Hasselbring rig requires a concrete floor for the storage tank to be first constructed in order to support the vertically disposed A-frames positioned around the inside of the wall of the tank to be erected.

These differences between the two rigs are material. First, Hasselbring's lower movable sheave block does not perform the same function as Jones' upper slidable block in the same way. Jones' arrangement requires the upper slidable block to be contained in a fixed guideway in order to stabilize the rig's operation. Second, Hasselbring's open 4-legged pyramidal center column does not perform the function of Jones' guideways within the center column. Properly operated, Hasselbring's lower movable block has no need for guideways. Third, Jones' rig requires radially positioned supporting bars emanating from the top of the central column to the tops of the A-frames. The Hasselbring rig needs no such supporting bars to maintain its A-frames vertically because they are bolted to the periphery of the prelaid concrete floor. The Hasselbring rig is not the Jones' rig turned upside down, nor vice versa. Neither rig would work as designed if either were inverted.

During prosecution of the Jones patent application in the United States Patent Office the scope of the claims was limited in the following principal respects:

1. Guideways were required to be positioned within the central column of the Jones rig.

---

2. There is an ambiguity in the record as to whether 11 or 12 storage tanks were erected with the Hasselbring rig. However, after studying the record and recalling the testimony, I resolve the ambiguity by determining there were 11 tanks erected: 2 for Caper Acres Inc. at Salisbury, Md., 2 for the Snow Hill Grain Co. at Snow Hill, Md., 6 for Caroline Farms at Laurel, Del. and 1 smaller tank for Albert Nesbit at Chestertown, Md.

2. Of the two sheave blocks mounted within the central column of the Jones rig, the upper one was required to be "vertically slidable in said guideways."

3. Radially positioned supporting bars at the top of the rig were required to be supported by the vertically disposed columns or A-frames (Claims 1 and 2) or to be of "length slightly less than the radius of the assembled ring section" of the tank being assembled (Claim 3).

These three limitations were and are significant. They were made in order to avoid the prior art relied on by the United States Patent Office, and they resulted in the allowance of the three claims of the patent in suit. Jones assured the Patent Office that his rig was distinctive from the prior art cited by the Patent Examiner because (a) the sheave blocks of one prior patent [3] were not slidable, hence "there is no need for any guideways within the column" (b) another reference [4] did not teach "any support means within the [central] column which would be analogous to applicant's guideways" and (c) applicant's three claims distinguished the prior art by including "a central column having guideways therein, upper and lower sheave blocks positioned in the guideways, the upper one of which is vertically slidable. Also set forth in applicant's claims are radially extending support members and the spaced vertical columns attached thereto to support the radial members."

██ The extensive prior art for lifting devices and rigs of all types cited by the Patent Office against Jones' purported invention and the additional prior art cited to this Court requires that the three claims of the patent in suit be narrowly construed in order to distinguish them patentably from this art and save them from invalidity. Tillotson Mfg. Co. v. Textron, Inc., Homelite, 337 F.2d 833 (C.A. 6, 1964); Messler v. United States Rubber Co., 148 F.2d 734 (C.A. 2, 1945), cert. den. 326 U.S. 717, 66

S.Ct 22, 90 L.Ed. 424 (1945). In order to obtain his patent, Jones surrendered all the broad claims which he originally sought in his application, covering a central column without guide members within it, sheave blocks either one of which might be vertically slidable, and radial bars which might or might not be supported by A-frames. Jones specifically limited his claims in these three principal respects and persuaded the Patent Office to grant his patent on the clear representation that these limitations were material and patentably distinguished his lifting device from the prior art. Under the doctrine of file wrapper estoppel, Jones cannot now reverse his position and contend that the same limitations are immaterial.

"Where the patentee in the course of his application in the patent office has, by amendment, cancelled or surrendered claims, those which are allowed are to be read in the light of those abandoned and an abandoned claim cannot be revived and restored to the patent by reading it by construction into the claims which are allowed." Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 218, 61 S.Ct. 235, 238, 85 L.Ed.2d 132 (1940). See also Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Schmidinger v. Welsh, 383 F.2d 455, 465 (C.A. 3, 1967); cert. den. 390 U.S. 946, 88 S.Ct. 1031, 19 L.Ed.2d 1134 (1968); Chemical Construction Corp. v. Jones & Laughlin Steel Corp., 311 F.2d 367, 372 (C.A. 3, 1962).

██ Jones, however, attempts to avoid the clear-cut file wrapper estoppel against him by invoking the doctrine of equivalents to recoup the broader coverage which he surrendered in the Patent Office. He contends Hasselbring's lower movable block is equivalent to his upper slidable block; that Hasselbring's center column in itself functions as a guideway for the movable block; and that the concrete floor of the tank to be

---

3. Wiggin-United States Patent No. 2,746,137.

4. Geraldson-United States Patent No. 968,339.

erected to which Hasselbring's A-frames are affixed is equivalent to his own support bars radially positioned at the top of his structure. But these contentions are untenable in the light of the limitations placed upon Jones' claims during the course of prosecuting his patent. Recourse may not be had to the doctrine of equivalents to recapture claims which the patentee surrendered by amendment in the Patent Office. As the Supreme Court held in the *Schriber-Schroth* case, supra, 311 U.S. p. 221, 61 S.Ct. p. 240:

> "The patentee may not, by resort to the doctrine of equivalents, give to an allowed claim a scope which it might have had without the amendments, the cancellation of which amounts to a disclaimer."

To the same effect is Parmelee Pharmaceutical Co. v. Zink, 285 F.2d 465, 472 (C.A. 8, 1961); Carter Products, Inc. v. Colgate-Palmolive Co., 269 F.2d 299, 304 (C.A. 4, 1959).

■ Further, the Hasselbring rig completely omits two of the three elements critical to the Jones' patent claims i.e. it has no guideways of any sort for the movable sheave block and it has no radially positioned supporting bars emanating from the top of the center column. As pointed out in a somewhat similar case in Sears, Roebuck & Co. v. Minnesota Mining & Mfg. Co., 249 F.2d 66, 68–69 (C.A. 4, 1957), cert. den. 355 U.S. 932, 78 S.Ct. 413, 2 L.Ed.2d 415 (1958), rehearing den. 356 U.S. 915, 78 S.Ct. 668, 2 L.Ed.2d 587 (1958):

> "* * * the doctrine of equivalents has no application where one of the elements called for is entirely omitted."

■ Accordingly, the Court concludes that Newton has neither infringed nor induced the infringement of Jones' patent in suit under 35 U.S.C. § 271 because the Hasselbring rig, the accused device, does not come within either the letter or the spirit of the three narrowly restricted claims of the Jones patent.

## THE UNFAIR COMPETITION ISSUE

By the second cause of action of the amended complaint, Jones sought to recover damages from Newton based on the accusation that Newton engaged in unfair competitive practices which were deliberately designed to drive Jones out of the tank erection business. Specifically, Jones charged that Newton, in attempting to accomplish that objective, acted maliciously and without just cause or excuse (1) by actively inducing Hasselbring to construct and use a power rig to erect storage tanks which infringed the claims of the Jones patent, (2) by deciding to enter the tank erection business on its own in 1966 in competition with Jones, (3) by wrongfully withholding monies due for erecting structures at the Laurel Grain Company, (4) by failing to make timely deliveries of parts to Jones for the Laurel Grain job, (5) by seeking to obtain confidential information from Jones as to his source of labor and pay scales, (6) by attempting to obtain a license under the Jones patent on condition that Jones would settle the Laurel Grain contract dispute and (7) by withholding from Jones an offer of $6000 to settle the Laurel Grain contract dispute.

■ The first specific unfair competitive act charged may be dismissed summarily as erroneous. The Court has previously found that the Hasselbring rig did not infringe the claims of the Jones patent and since the Hasselbring rig was the only device accused of infringement, it follows, and the Court so holds, that Newton could not and did not induce Hasselbring to commit any acts of infringement. Further, the Court finds and concludes that Jones has failed to prove by a preponderance of the evidence that Newton maliciously and in bad faith engaged in the other unfair competitive practices specifically charged.

Having seen and heard the witnesses testify and having considered, reconciled and weighed the credibility and value of the testimony and all evidence adduced, the Court finds the facts relevant to the remaining unfair competitive practices charged to be as follows:

■ Newton, a Delaware corporation with its principal office in Bridgeville, Delaware, was and is engaged in a variety of business activities which were conducted through seven different departments.[5] The Industrial Department, which handled the sale and erection of grain storage tanks, accounted for approximately one-fifth of Newton's overall volume of business.[6] Between February, 1960 and July, 1965, when Jones contracted with Newton to erect structures for the Laurel Grain Company, Newton had been responsible for arranging the erection of grain storage tanks under fifty-four different contracts. Newton performed the erection work with its own personnel for nine of those contracts and subcontracted the erection work with four different contractors for the remaining forty-five contracts. Between July, 1965, and April, 1967, Newton was responsible for tank erection work under fifty-six additional contracts of which twenty-one were erected by Newton's own personnel and the work for the remaining thirty-five was performed by five different contractors, including Jones. There is no creditable evidence that Newton decided to enter the tank erection business on its own in 1966 in competition with Jones for the purpose of driving the latter out of business. The undisputed facts clearly indicate that Newton was in the storage tank selling and erection business as early as 1960 and continued in that business until at least April, 1967.[7] Through-

out that period both before and after 1966 Newton performed some of the erection work with its own crews although by far in the greater number of cases the work was done by other subcontractors. Thus, Jones' contentions that in the summer of 1965 Newton "determined that plaintiff was making too much money with his patented, tank erection rig and set out to drive plaintiff out of business" and in order to accomplish that end, decided "to enter the tank erection field the following year" is not supported by any creditable evidence adduced at the trial of this case.

Sometime in June, 1965 Newton made a proposal to sell and erect several grain storage tanks and associated equipment to the Laurel Grain Company. Because the proposed installations had to be completed by September 15, 1965 and because tank erectors were in short supply, Newton asked Jones to erect the structures as Newton's subcontractor if Newton were awarded the contract. Jones orally agreed. Kenneth Prettyman and Bryon Wise, two of Newton's employees who were handling the Laurel Grain proposal, had known Jones for some time and recognized and appreciated his good reputation as a tank erector. Jones attended a meeting of the Board of Directors of the Laurel Grain Company with Dr. John Hammond, President of Newton, and Messrs. Prettyman and Wise when the proposal was made. At that time Laurel Grain agreed to purchase from Newton three storage tanks 48 feet in diameter, a Hess grain dryer and associated equipment and left open the possible addition of a fourth storage tank. Following the meeting with Laurel Grain, Jones met with Prettyman and Wise in Newton's offices to agree upon the amount to be paid to Jones for

---

5. The seven departments were: (1) broiler growing, (2) farm machinery, (3) feedmill, (4) hatchery, (5) appliances, (6) industrial and (7) catch-all.

6. The broiler growing department accounted for the largest percentage of Newton's over-all business volume.

7. There is no evidence in the record of Newton's tank erection business after April, 1967.

the erection work. Prices were agreed to on the major items and it was further agreed that for incidental items Jones would receive 22½% of the cost price. Handwritten notes of the meeting, made by Prettyman in ink showing the basic prices on the major items agreed upon, also contained a notation that the prices did not include "spouting or conveyor over wet bins." Sometime later when the size of the remaining items and cost of materials not previously known were ascertained, their total cost, including the cost of the "spouting and conveyor over the wet bins", was computed and the price to be paid Jones for installation of the incidental items was calculated at 22½% of the total cost or $4433.40.

Jones commenced the erection of the Laurel Grain structures late in June, 1965 and by July 7, 1965, a fourth grain storage tank had been added to the contract. During the course of the work between July 23, 1965 and October, 1965, Jones submitted five invoices to Newton totalling $46,110.10. Newton advanced to Jones during this same period checks totalling $49,325.79. Newton issued a Purchase Order, dated August 9, 1965, which Jones never accepted. Adjusting for the concrete dryer slab which was to be constructed at $37.50 per square foot and invoiced by Jones to Newton at $1050, the total price to be paid to Jones under the Purchase Order was $43,053.-40. A Change Order, dated August 13, 1965, was also issued by Newton, but never formally accepted by Jones, which increased the dryer erection price by $569.-00 for additional erection time and by $1670.00 for correcting fabrication errors, so that the total amount due Jones under the Purchase and Change Orders was $45,292.40. The prices shown on the Purchase Order conformed to the prices orally agreed to by Jones, Prettyman and Wise at the original meeting in Newton's office following the award of the contract to Newton by Laurel Grain.

In July 1965, Jones began the erection of the Hess grain dryer. Before construction was well under way, a chance remark made by a representative of the dryer company created a dispute which led Jones to order his workmen off the job. The comment made by the representative was that the manufacturer's estimate of erection time was 3000 hours. The original price orally agreed upon to erect the dryer for $5,000 was arrived at on the basis that it would take 1,100 hours. Mr. Prettyman called the home office of the dryer manufacturer and, upon discovering that an allowance of an additional 125 hours for auxiliary work had been overlooked, agreed to issue a Change Order increasing the erection cost by $569.00. Prettyman also discussed with the manufacturer Jones' complaints about missing and misfabricated parts. Jones had estimated that these manufacturing defects would increase his work by 30 per cent so that the dryer manufacturer agreed that $1,670 could be charged back to it by Newton for these errors. The Change Order previously referred to reflected these price increases. Jones, however, contends that he resumed work only because Prettyman agreed to pay him $5 per hour for 3000 hours to erect the dryer.[8] Jones invoiced Newton for erecting the dryer in October, 1965 for $9500, instead of $7239.00 reflected in the Change Order, and this invoice was paid by Newton who noted that it was overpaying for this item.

When the erection work was completed, Jones submitted an invoice dated about November 15, 1965 to Newton showing a balance due of $2509.31 and a general statement for "loss of time and efficiency" or "for numerous extra work and cost not previously billed $3500.00" or a total $6009.31. Several attempts by Newton to ascertain from Jones a breakdown or justification for these additional items on the last invoice was unproductive and on December 15, 1965, Newton's

8. Jones testified that he completed the erection of the Hess dryer in less than 1,225 hours.

attorney wrote Jones for such a breakdown or justification. None was forthcoming.

Jones submitted another statement to Newton under date of April 15, 1966 showing a principal sum of $6191.39 plus a service charge of $61.91 to be due. In response to this statement, Newton's attorney wrote Jones stating that he was under the impression from his previous telephone call to Jones that Jones would submit a breakdown of the balance he claimed to be due from Newton, that Newton had believed from the beginning that Jones had been fully compensated for all the work performed including extras, and that Newton could not justify to their auditors a lump sum payment to Jones unless they were made aware of the nature of the additional charges demanded. Jones responded to this letter on May 4, 1966 stating, in part:

\*     \*     \*     \*     \*     \*

"In view of your correspondence to me and our last telephone conversation it is obvious that you are unfamiliar with realities creating a bill for $6253.30, therefore it would be a waste of your time and mine to attempt to sit down and determine anything concerning the same.

\*     \*     \*     \*     \*     \*

Mr. Raysor either known or unknown to you I will collect the amount in question plus a 1% monthly service charge. (The world of business?)."

With the dispute with Jones unresolved in April, 1966 and having other tank erection contracts to be performed, Newton found it necessary to turn to other tank erectors. Among others, Hasselbring was approached by Newton to erect six storage tanks for Caroline Farms at Laurel, Delaware. Hasselbring agreed to act as subcontractor. He used a power lifting device which he designed and built and which has been previously discussed.

On or about June 24, 1966, Jones visited one of the sites at Snow Hill where Hasselbring was working and informed a Newton salesman that Hasselbring's rig infringed the claims of Jones' patent. Because of this charge, Newton's Executive Committee at a meeting held on June 28, 1966 authorized Hammond to obtain a validity search of Jones' patent. On June 30, 1966, Jones without a prior appointment met with Hammond. Accompanying Jones to this meeting was Mr. Weaver, Jones' patent attorney. During the course of this meeting Mr. Weaver proposed a one-year temporary licensing arrangement by which Newton would pay $200 to Jones for each 48 foot diameter storage tank sold by Newton and erected by a power rig. Hammond, on July 7, 1966, telephoned Mr. Weaver and requested him to prepare a licensing agreement as he had previously proposed for submission to Newton's Board of Directors. However, Mr. Weaver replied that he had since been instructed by Jones not to prepare such a license until the contract dispute with Jones had been resolved.

About July 12, 1966 Jones again met with Hammond and for the first time submitted a written list of his alleged extras for the Laurel Grain job which then totalled $7931.81. Hammond, Prettyman and Wise reviewed the list in an attempt to determine the validity of the additional claims. The following day, Hammond reported to Newton's Executive Committee Jones' revised claim, the review that had been made of it and the fact that there might be some items to which Jones was entitled to payment. Hammond was instructed to attempt to settle the contract dispute and patent matter at the same time. At a further meeting of the Executive Committee on July 27, 1966, Hammond was authorized to settle the contract claims by paying $6000 to Jones for the reason that it was conceivable that additional money could be justified, otherwise a lawsuit seemed inevitable, would be time consuming, annoying and might cost more in legal fees and in time lost than any actual amount that possibly could have been due. Hammond never transmitted this authorized

offer of settlement to Jones because Jones refused to discuss his contract claims until the alleged patent infringement matter was resolved. The present suit followed on October 15, 1966. At trial, Jones produced still another different and larger itemization of his claims.

■ The most that can be said from these facts is that a good-faith dispute existed between the parties whether Jones was entitled to any further payments for the Laurel Grain job. From the manner in which the dispute arose and developed, it is obvious that no monies were withheld from Jones in bad faith with the intention of driving him out of business. Jones' claims which continually varied upon each submission could not be expected to be accepted without question from Newton. Failure of Newton to pay the increasing sums demanded by Jones was no more than a good-faith business judgment unmotivated by any desire to deprive Jones of a just debt.

■ The same is true with respect to Jones' contentions that Newton sought a license under his patent on condition he would settle the Laurel Grain dispute and that Hammond withheld the offer to settle the dispute for $6000 as authorized by Newton's Board of Directors. The evidence adduced at trial does not show either of these acts were maliciously motivated. The fact is Jones through his attorney, Weaver, first approached Newton with the proposal that Newton be given a one-year temporary license under the Jones patent. Newton did not make this proposal. Then when Newton asked for the concrete proposal for consideration by its Board, Jones refused to proceed with his original license offer.

As to the authorized settlement offer, Newton's Executive Committee concluded that if all the matters in dispute, the monetary claim and the patent issue, could be resolved, Hammond was authorized to pay Jones $6000 to avoid litigation. It was because of Jones' recalci-

trance regarding settlement of both claims that the offer was not made. The present record is completely devoid of any creditable evidence that these acts were taken in bad faith so as to amount to unfair competition. To the contrary, the evidence reveals that they were honest business judgments taken on Newton's part in the face of a bona fide dispute between the parties. The Court, therefore, concludes that Jones has not proved by a preponderance of the evidence that Newton's failure to pay his varying money claims, Newton's negotiations with respect to a license agreement and Newton's failure to transmit the authorized settlement figure amounted to acts of unfair competition.

When work first began on the Laurel Grain project and the preparatory work of digging out the emplacement for the footings of the structures, Newton ordered Jones to stop work. There was about a four hour delay waiting to hear from Newton. Newton later advised Jones not to proceed in the excavated area until a further check could be made concerning a possible problem relating to the water table. As a consequence, Jones was instructed to continue his work in another area during which it rained. The rain washed out parts of the original excavation which had to be reworked later.

■ Later in July, 1965, further delays developed in connection with the erection of the Hess dryer. First, there was the dispute, which has already been discussed above, over the number of hours estimated by the manufacturer that it would take to erect the dryer. Second, there were delays with the erection of the Hess dryer and the fourth storage tank (the Reed Tank) because many of the bolts and nuts did not match and because of misfabrication of interrelated parts. Jones contends these delays were deliberately and intentionally caused by Newton. The evidence adduced, however, does not support this contention. Jones admitted that Newton's contract with Laurel Grain contained provisions imposing a penalty of $200 per day for every

day the structures were not completed by September 15, 1965. It was not to Newton's benefit to cause Jones any delay in the erection of the structures. Further, other than the initial delay in laying the concrete foundation, the difficulties incurred with missing bolts and nuts and in misfabrication was beyond Newton's control. The manufacturers of the dryer and tank had caused these delays. The evidence clearly indicates that any delays entailed were not intentionally caused by Newton and did not amount to an unfair competitive practice as alleged by Jones.

Jones' final contention that Newton engaged in unfair competition by seeking to obtain confidential information from Jones as to his source of labor and pay scales is also unsupported by any creditable evidence. Jones testified that on two or three occasions during the Laurel Grain job, Wise, one of Newton's employees, asked Jones where he found his emyployees and how much he paid them per hour. Wise did not state the reason for his curiosity and was not answered by Jones. In any event, this testimony does not sustain the burden of proof required to support Jones' charge that Wise's inquiries amounted to acts of unfair competition. The record is completely devoid of any showing that Wise was interested in this information other than from idle curiosity. Further, the record indicates Wise was unable to obtain an answer to the questions asked Jones.

Consequently, on the basis of the present record, the Court concludes that Jones has failed to prove by a preponderance of the evidence that Newton engaged in any unfair competitive practices as charged.

The foregoing shall constitute the findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

For the reasons stated, Newton is entitled to judgment against Jones on both causes of action.

Submit judgment.