**JENN-AIR CORPORATION, a Delaware Corporation, Plaintiff,**

v.

**MODERN MAID COMPANY, a Delaware Corporation, Defendant.**

**Civ. A. No. 80-122.**

United States District Court,
D. Delaware.

Oct. 3, 1980.

**322**

Jeffrey M. Weiner of Bayard, Brill & Handelman, P.A., Wilmington, Del., William A. Marshall and Alvin D. Shulman of Merriam, Marshall & Bicknell, Chicago, Ill., and J. Raymond Curtin, Syracuse, N. Y., of counsel, for plaintiff.

Arthur G. Connolly and Arthur G. Connolly, Jr., of Connolly, Bove & Lodge, Wilmington, Del., and Richard M. Beck, Wilmington, Del., of counsel, for defendant.

1. This Court has jurisdiction under 28 U.S.C. § 1338(a) and venue is proper under 28 U.S.C. § 1400(b).

2. Docket Item ("D.I.") 6A, Ex. 15.

## OPINION

LATCHUM, Chief Judge.

This is a patent infringement suit brought by Jenn–Air Corporation ("Jenn–Air") against Modern Maid Company ("Modern Maid") charging the latter with infringement of Jenn–Air's U.S. Patent No. 3,367,320 (" '320 patent") entitled "Self–Ventilating Cooking Range."[1] The alleged infringing device· is a built–in ventilator, marketed as a Wisp–Air Vent System, which is incorporated in Modern Maid's Model KET 595 cooking range.[2] The case is presently before the Court on Jenn–Air's motions (1) for a preliminary injunction[3] and (2) for judgment on the pleadings with respect to certain claims allegedly contained in Modern Maid's Second Counterclaim.[4] These motions will be considered *seriatim*.

### I. *Motion for Preliminary Injunction*

The standard for granting a preliminary injunction against infringement in a patent suit is an unusually high one. While the requisite showing on the merits in other types of cases is the probability of success, the party seeking preliminarily to enjoin infringement must demonstrate "beyond question" that the. patent is valid, that the patent is infringed and that the party seeking such relief has valid title to the patent. *Mayview Corp. v. Rodstein*, 480 F.2d 714 (C.A.9, 1973); *Eli Lilly & Co. v. Generix Drug Sales, Inc.*, 460 F.2d 1096 (C.A.5, 1972); *Carter–Wallace, Inc. v. Davis–Edwards Pharmacal Corp.*, 443 F.2d 867 (C.A.2, 1971); *Simson Bros.· v. Blancard & Co.*, 22 F.2d 498, 499 (C.A.2, 1927); *Zenith Laboratories Inc. v. Eli Lilly & Co.*, 460 F.Supp. 812 (D.N.J.1978); *Heyman Mfg. Co. v. Electrix Corp.*, 200 F.Supp. 217 (D.R.I. 1961). In other respects, the standard for granting a preliminary injunction against infringement in a patent suit is the same as that applicable to other types of cases. The party seeking an interlocutory injunction

3. D.I. 6.

4. D.I. 13.

thus must also show that it will be irreparably injured *pendente lite* if relief is not granted and, in addition, if relevant, the Court must also consider the possibility of harm to other persons from the grant or denial of the injunction, and the public interest. *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.* 630 F.2d 120 (C.A.3, 1980); *Mayview Corp. v. Rodstein, supra; Eli Lilly & Co. v. Generix Drug Sales, Inc., supra; Zenith Laboratories, Inc. v. Eli Lilly & Co., supra.*

### A. The Probability of Success on the Merits

The Court finds that Jenn–Air's probability of success on the merits is problematic at best and certainly not "beyond question." While there is competent and uncontradicted evidence demonstrating Jenn–Air's ownership of the '320 patent,[5] Jenn–Air has failed to show that the patent is "beyond question" valid and infringed.

### 1. Validity

 Although in most patent suits the Court will start its analysis with the presumption that the patent is valid and place the burden of demonstrated invalidity by clear and convincing proof upon the party asserting invalidity, 35 U.S.C. § 282; *Aluminum Co. of America v. Amerola Products Corp.*, 552 F.2d 1020, 1024 (C.A.3, 1977); *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp.*, 546 F.2d 530, 540 (C.A.3, 1976), *cert. den.*, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977) this is not true where interlocutory equitable relief is requested. Where a preliminary injunction is sought against infringement "[t]he presumption of validity is too slim a reed" upon which to support a finding of validity. *Mayview Corp. v. Rodstein, supra*, 480 F.2d at 718. Hence, the burden is upon the party seeking *pendente lite* relief to produce independent evidence in support of validity, such as a prior adjudication of validity rendered on relevant grounds, public acquiescence in a situation where one would normally expect a challenge to or infringement of an invalid patent, or conclusive direct technical evidence. *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.*, supra, 630 F.2d at 136, n.73; *Mayview Corp. v. Rodstein, supra*, 480 F.2d at 717; *Carter–Wallace, Inc. v. Davis–Edwards Pharmacal Corp.*, supra, 443 F.2d at 871–74; *Rosenberg v. Groov–Pin Corp.*, 81 F.2d 46 (C.A.2, 1936); *Zenith Laboratories, Inc. v. Eli Lilly & Co.*, supra, 460 F.Supp. at 820–21. The rationale behind this rule was first enunciated in an oft-quoted passage written by Judge Learned Hand in *Rosenberg v. Groov–Pin Corp., supra*, 81 F.2d at 47:

> The doctrine that in the absence of long acquiescence or adjudication [a preliminary] injunction [in a patent suit] will not go, is at first blush anomalous in the light of the presumption of validity which courts generally grant to a patent once issued. * * * The theory is * * * practical. Examiners have neither the time nor the assistance to exhaust the prior art; nothing is more common in a suit for infringement than to find that all the important references are turned–up for the first time by the industry of a defendant whose interest animates his search. It is a reasonable caution not to tie the hands of a whole art until there is at least the added assurance which comes from such an incentive.

The validity of the '320 patent in suit has not been determined by any prior adjudication. To demonstrate validity, therefore, Jenn–Air relies upon public acquiescence and direct technical evidence. Modern Maid, on the other hand, argues with some force that the indicia of public acquiescence do not, in this case, support the inference that the technical community has closely examined the '320 patent and judged it valid. Modern Maid further contends that the '320 patent is, in fact, invalid because it is merely an obvious modification of prior art, 35 U.S.C. § 103, and has presented

---

**5.** A certified copy of the '320 patent (D.I. 6A, Ex. 1) and a certified copy of the assignment of that patent by the inventors, Louis J. Jenn and Thomas R. Field to Jenn–Air (D.I. 6A, Ex. 7) have been submitted to establish Jenn–Air's title.

direct technical evidence supporting that contention.

### (a) *Industry acquiescence*

■ Courts have relied upon acquiescence by the industry as evidence of validity on the basis of the rationale that the failure of others in the industry to infringe the patent or to challenge it in court raises an inference that those who are skilled in the relevant art and who have an economic incentive to challenge the patent have examined it and determined that it is valid. *Carter–Wallace, Inc. v. Davis–Edwards Pharmacal Corp., supra,* 443 F.2d at 872–73; *Rosenberg v. Groov–Pin Corp., supra,* 81 F.2d at 48; *Zenith Laboratories, Inc. v. Eli Lilly & Co., supra,* 460 F.Supp. at 821–22. This inference may be supported or rebutted by other circumstantial evidence. For example, the long–standing commercial success of the patented product, the presence of fierce competition in the industry, and the fact that a patent was the product of an industry–wide search for a solution to an unmet need have all been found to reinforce the inference of validity raised by acquiescence. *Zenith Laboratories v. Eli Lilly & Co., supra; Eli Lilly & Co. v. Generix Drug Sales, Inc.,* 324 F.Supp. 715 (S.D. Fla.1971), *aff'd in part and vac. in part,* 460 F.2d 1096 (C.A.5, 1972); *Norwich Pharmacal Co. v. Veterinary Corp. of America,* 296 F.Supp. 937 (M.D.Ga.1968). However, evidence that acquiescence could have been caused by factors other than belief in validity will rebut the inference of validity and, in that case, acquiescence cannot be used to establish validity "beyond question." *Carter–Wallace, Inc. v. Davis–Edwards Pharmacal Corp., supra,* 443 F.2d at 873.

The Court finds that Jenn–Air has failed to meet its burden of showing industry acquiescence that would raise a controlling inference that others in the industry had examined the '320 patent and determined it to be valid. First, the Court finds that Jenn–Air has failed to produce any evidence on the present record from which the Court could conclude that no other competitors have entered the market with ranges incorporating the self–ventilating feature described by the '320 patent.[6] However, even if the Court assumes that the industry has acquiesced and that, from February, 1968, when the patent was issued,[7] until Modern Maid entered the market in 1980, no other competitors had sold ranges incorporating a self–ventilating feature similar to the one claimed in the '320 patent, the Court is still unable to find that the assumed acquiescence raised an inference that experts in the industry had examined the patent and determined that it was valid. Rather, the Court, on the basis of the evidence before it, has concluded that it is as likely as not that the assumed acquiescence was due to factors unrelated to the validity of the '320 patent.

First, the existence of other patents covering various features of the Jenn–Air product into which the feature described by the '320 patent is incorporated makes it impossible to infer the validity of the '320 patent from the assumed industry acquiescence. The '320 patent describes a feature which may be incorporated into electric ranges so as to make those ranges "self–ventilating," employing a down–draft ventilating system which by means of a fan draws cooking odors, smoke and vapors through an elongate air inlet opening in the range top, thus creating a zone of low pressure immediately above the surface of the range top and extending adjacent to the area immediately above the series of aligned cooking elements (e. g., a line of burners, an electric grill, etc.) so as to effect a more efficient capture of the cooking odors, smoke and vapors than would con-

---

**6.** Jenn–Air's counsel stated in its brief (D.I. 6, p. 14) that until the introduction of the Modern Maid self–ventilating range in 1980, Jenn–Air was the sole source of this type of product and had been for 13 years, citing only the Gaither Affidavit (D.I. 6B). That affidavit contains no information which could possibly lead to the conclusion that the acquiescence claimed by counsel had, in fact, occurred. The Court has made an independent search of the record for any evidence supporting the claim of acquiescence and has failed to find any.

**7.** D.I. 6A, Ex. 1.

ventional overhead hood–type ventilating systems.[8] Jenn–Air does not market the feature described by the '320 patent as a separate product, but rather, markets ranges into which that feature has been incorporated.[9] The Jenn–Air range which most closely resembles the allegedly infringing Modern Maid range has a label attached which states that it is manufactured under one or more of U.S. Patents 3,180,331; 3,712,819; 3,587,555; 3,102,533; 3,444,805; 3,367,320; 3,474,724; 3,409,005; and 3,596,650, followed by the statement "U.S. and Foreign Patents Pending."[10] The existence of these other patents makes it impossible to infer validity from the assumed acquiescence for two reasons. First, the industry could have concluded that any commercial success which Jenn–Air's products may have achieved was due to features covered by the other patents and refrained from copying the '320 patent because it had reached the conclusion that the '320 patent was not of sufficient commercial value in its own right to warrant even the costs of defending an obviously meritless infringement action. Secondly, those other patents may be valid and their validity alone may have deterred others in the industry from copying the '320 patent. For example, one patent may cover a device without which it would be difficult or much more expensive to build the '320 system into an electric range and, consequently, the industry may have acquiesced because of the valid patent on the other feature. On the other hand, there might also be a valid patent on a commercially attractive feature which could not be incorporated into an electric range which was not equipped with a venting system of the type described by the '320 patent and it may be that the value of the '320 patent lies only in the fact that it makes this other feature possible. In that case, industry acquiescence could be attributed to a judgment that the patent on the other feature is valid. Thus, without more information, the existence of other patented features in the Jenn–Air range, which features have not been disclosed to this Court, makes it impossible to conclude that the assumed industry acquiescence was in any way caused by the '320 patent.

The Court also finds that the assumed industry acquiescence does not raise the inference of validity for the further reason that that acquiescence may have been due solely to the fact that, until recently, competitors believed that the market for ranges incorporating the self–ventilating feature described by the '320 patent was insufficiently large to justify even the costs of litigating a challenge to an obviously invalid patent. The Modern Maid range was designed and commercialized for the "fashion segment" of the kitchen appliance industry, and Modern Maid entered the market in 1980 only because that segment of the market has grown dramatically in the past few years and by inference, has only recently become substantial enough to attract entry.[11] Sales of the Jenn–Air ranges incorporating the '320 feature reveal that while the sales have grown geometrically since the first introduction of the range in 1966, sales and the market have only become substantial in the last several years.[12] Indeed, the '320 ventilation system initially met with skepticism in the market place,[13]

8. D.I. 6B, Jenn Affidavit, ¶¶ 9 and 13.

9. D.I. 6B, Gaither Affidavit; Jenn Affidavit, ¶ 8.

10. D.I. 17, ¶ 14.

11. D.I. 17, ¶ 6.

12. The annual sales data is as follows (D.I. 18, Ex. A):

| Year | Units | Sales |
| --- | --- | --- |
| 1979 | 237,196 | 59,794,013 |
| 1978 | 222,894 | 51,966,469 |
| 1977 | 168,701 | 38,435,793 |
| 1976 | 120,357 | 26,288,236 |
| 1975 | 62,220 | 11,498,838 |
| 1974 | 55,192 | 9,463,327 |
| 1973 | 47,690 | 7,870,114 |
| 1972 | 31,968 | 4,953,596 |
| 1971 | 20,580 | 2,910,146 |
| 1970 | 13,891 | 1,927,228 |
| 1969 | 13,666 | 1,783,214 |
| 1968 | 8,220 | 1,093,686 |
| 1967 | 2,645 | 316,981 |
| 1966 | 103 | 12,001 |
| 1965 | – 0 – | – 0 – |

13. D.I. 6B, Jenn Affidavit, ¶ 33.

and because of this skepticism, intensive education and instructional sales programs were necessary in order to acquaint distributors, dealers and customers with the operational ability and advantages of the grill–range units [14] and Jenn–Air expended large amounts of money in advertising its product to create a more extensive market.[15] Given these facts, one could conclude that in the early years of the '320 patent, competitors refrained from infringing that patent because there was not a sufficiently large market to encourage infringement and, in fact, were discouraged from entering the market with ranges incorporating '320 type ventilation systems because of the high advertising costs that would have been required to create a market. It can reasonably be inferred that competitors are entering the market only at this time, 13 years after the '320 patent was issued, due to the fact that only recently has Jenn–Air's advertising campaign borne fruit and overcome the public's initial skepticism sufficiently to create the market and the incentive for infringement.

Jenn–Air also argues that industry acquiescence which would raise an inference of validity is also evidenced by the fact that "several appliance manufacturers expressed interest in obtaining a license under the '320 patent private labeling or outright purchase of the company" and when their requests were refused nevertheless refrained from infringing or otherwise challenging the patent.[16] The limited facts relating to this issue presented in the affidavits submitted by Jenn–Air are also not sufficient to support an inference that the industry has examined the patent, found it valid, and consequently acquiesced. First, the fact that other companies may have sought to purchase Jenn–Air raises no inference whatsoever in regards to the patent, although it may raise an inference as to the value of the company's principal product–its ranges–into which the features of the '320 patent, as well as a number of other patents, are incorporated. Secondly, while the interest of competitors in obtaining licenses and their subsequent non–infringement after a license is refused may lead to the inference of a judgment of validity, in this case that inference cannot be made. First, the dates of the inquiries are not given. The competitors may have recently made preliminary inquiries and are now in the process of examining the patent and the market to determine the costs and benefits of entering the market and subjecting themselves to litigation. Secondly, the terms of the negotiations are not given. The competitors seeking licenses may have offered a nominal sum for a license that would be, in effect, no more than a license to enter the market without litigation and, upon being refused, have made a determination that the costs of litigation alone would make it more worth their while to wait a few short years until the patent expired. Thirdly, Jenn–Air has specifically mentioned only one domestic competitor who made inquiries regarding a license under the '320 patent.

■■ Finally, Jenn–Air argues that favorable comments in "trade–journals" constitute independent evidence supporting validity. Articles commenting favorably upon a patented product may constitute evidence of a patent's validity in two ways. First, favorable comments in trade and public publications may be evidence that supports

---

**14.** D.I. 6B, Gaither Affidavit, ¶ 12.

**15.** The yearly advertising expenditures are as follows (D.I. 18, Ex. B):

| Year | Advertising (in dollars) |
| --- | --- |
| 1965 | 60,259 |
| 1966 | 122,474 |
| 1967 | 179,122 |
| 1968 | 353,383 |
| 1969 | 268,228 |
| 1970 | 180,236 |
| 1971 | 267,356 |
| 1972 | 353,957 |
| 1973 | 684,476 |
| 1974 | 956,783 |
| 1975 | 1,467,375 |
| 1976 | 2,245,988 |
| 1977 | 3,352,328 |
| 1978 | 4,225,202 |
| 1979 | 4,587,959 |

**16.** D.I. 6B, Jenn Affidavit, ¶ 33.

the inference of validity raised by acquiescence, since such comments would encourage competitors to infringe or to challenge in some other way an invalid patent. *See Teledyne Industries, Inc. v. Windmere Products, Inc.*, 433 F.Supp. 710, 714 (S.D. Fla.1977). Secondly, such articles may be direct technical evidence of non–obviousness. *Tile Council of America, Inc. v. Ceramic Tilers Supply, Inc.*, 159 U.S.P.Q. 204, 216, ¶ 53 (C.D.Cal.1968), *aff'd*, 169 P.Q. 268. The publications which Jenn–Air has presented to the Court cannot sufficiently support validity in either manner.[17] All the articles mention the down–draft feature covered by the '320 patent only as one of many attractive features, and one of many patented features, in a generally very high quality product, and lavish their praise on the product as a whole. For this reason, the articles, like the other evidence relating to acquiescence, do not lead the Court to conclude that there was a large incentive to copy the '320 feature in particular or to infer from that inference and from the assumed fact of acquiescence that the patent had been examined and judged valid. Only one of the cited articles could be deemed a technical article, but after reading it, the Court has concluded that although it may be some evidence in favor of a finding of non–obviousness, it certainly is not strong enough to establish validity beyond question.[18]

(b) *Technical evidence of validity*

Jenn–Air has also presented some direct technical evidence in support of validity in order to refute Modern Maid's claim of obviousness, apparently the only technical challenge raised against the '320 patent for the purposes of this motion. That evidence, however, limited to an affidavit submitted by Louis J. Jenn,[19] the inventor of the '320 patent, is directly refuted by an equally credible affidavit submitted by Modern

Maid,[20] and is clearly insufficient to support a finding that the '320 patent is valid beyond question.

A patent may not be obtained if its "subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. The nature of the inquiry to be made and the factors to be considered in determining whether a patent was obvious are well established:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. [*Graham v. John Deere Co.*, 383 U.S. 1, 17 [, 86 S.Ct. 684, 693, 15 L.Ed.2d 545] (1966)] In addition, ... secondary considerations might have relevancy in determining obviousness and listed such matters as the commercial success of the device, long felt but unresolved needs, and the failure of others. *Id.* But these factors "cannot, by themselves, support a finding of nonobviousness if it is otherwise established that a patent's disclosures are obvious in light of the prior art." *Tokyo Shibaura Electric Co. v. Zenith Radio Corp.*, 548 F.2d 88, 94–95 (3d Cir. 1977).

*Sims v. Mack Truck Corp.*, 608 F.2d 87, 90 (C.A.3, 1979).

The affidavits submitted by both parties address themselves directly to the primary inquiries required by *Graham v. John Deere Co., supra.* The two affiants, both skilled in the relevant prior art, not surprisingly, reach opposite conclusions regarding obviousness. Mr. Jenn's affidavit,[21] after describing the '320 patent, identifies three prior art patents cited by the Patent Office,

---

**17.** D.I. 6A, Ex. 9; D.I. 6, pp. 12–13 (quotations appearing in Jenn–Air's brief).

**18.** D.I. 6A, Ex. 9, "Electric Grill Out–Performs Outdoor Charcoal Grill," IAEI News (July/August 1971). That article discusses the product as a whole as a new and worthy product, directing its praise at many features. The fea-

tures of the '320 patent are not compared with the relevant prior art and the patent is not clearly described as a new technical breakthrough.

**19.** D.I. 6B, Jenn Affidavit.

**20.** D.I. 17.

**21.** D.I. 6B, Jenn Affidavit.

the Schaefer,[22] Morasch,[23] and Jenn[24] patents, distinguishes them, and finds the '320 patent non–obvious. He does the same with the O'Connell patent,[25] a concededly relevant patent which was not cited by the Patent Office. On the other hand, Modern Maid has submitted the affidavit of Leroy J. Berlik, Modern Maid's Vice President–Engineering, whom the Court finds to be skilled in the relevant art.[26] Mr. Berlik finds the '320 patent obvious in light of the Morasch, Schaefer and O'Connell patents, finding the uncited O'Connell Patent to reveal practically the same features as those described by the '320 patent.[27] Mr. Berlik convincingly concludes:

> The above prior art patents clearly explain the simple principles of downdraft ventilation through a cooking surface. Anyone familiar with the design and manufacture of cooking ranges who wished to make use of these well known principles would conduct a few routine experiments to determine the precise location of the ventilator on any desired cooking surface as well as its specific dimensions and configuration. These routine experiments would inevitably lead to downdraft ventilators which are identical to those embodied in the various Jenn–Air cooking ranges and in Modern Maid's KET–595 as well as others designed for somewhat different cooking surfaces and ranges.[28]

Thus, the only direct technical evidence in support of validity is directly refuted by an equally convincing affidavit which relies heavily upon a patent which was not cited to the Patent Office and against which the presumption of validity will not lie. In light of this fact and in light of the very limited record which is before it, the Court cannot conclude that Jenn–Air has met its burden in proving validity "beyond question" on the basis of direct technical evidence. See Superior Electric Co. v. General Radio Corp., 194 F.Supp. 339 (D.N.J.1961); Tyrolean Handbag Co. v. Empress Hand Bag, Inc., 122 F.Supp. 299, 302 (S.D.N.Y. 1954).

### 2. Infringement

Even if the Court were to find that Jenn–Air had established validity beyond question, it would be unable to find that Jenn–Air had shown a probability of success on the merits. This is so because it has found that the Wisp–Air Vent System probably does not infringe the limited claims of the '320 patent that remained after its prosecution in the Patent Office. Jenn–Air contends that Modern Maid's Wisp–Air Vent System literally infringes the '320 patent and that, even if the Court should find no literal infringement, nevertheless infringement should be found under the doctrine of equivalents. See Graver Manufacturing Co. v. Linde Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). On the other hand, Modern Maid contends that the Wisp–Air Vent System does not literally infringe the claims of the '320 patent. Furthermore, Modern Maid argues that Jenn–Air may neither expand the limited claims of the patent so that those claims would encompass the features of the Wisp–Air Vent System nor may it avail itself of the doctrine of equivalents because it is barred from so doing by file wrapper estoppel. See Graham v. John Deere Co., supra, 383 U.S. at 33–34, 86 S.Ct. at 701–02; Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–37, 62 S.Ct. 513, 518–19, 86 L.Ed. 736 (1942); MacKay Radio & Telegraph Co. v. Radio Corporation of America, 306 U.S. 86, 102, 59 S.Ct. 427, 434, 83 L.Ed. 506

**22.** Schaefer, U.S. Patent No. 2,674,991 (D.I. 6A, Ex. 12).

**23.** Morasch, U.S. Patent No. 3,002,513 (D.I. 6A, Ex. 13).

**24.** Jenn et al., U.S. Patent No. 3,102,533 (D.I. 6A, Ex. 2).

**25.** O'Connell, U.S. Patent No. 2,076,479 (D.I. 6A, Ex. 14).

**26.** Mr. Berlik holds a graduate degree in mechanical engineering and has experience in the design and engineering of built–in electric cooking ranges with down–draft ventilating systems (D.I. 17, ¶¶ 2 & 3), and consequently has at least the level of skill of one working in the relevant art, even as defined by Mr. Jenn in his affidavit. (D.I. 6B, Jenn Affidavit, ¶ 31).

**27.** D.I. 17, ¶ 12.

**28.** D.I. 17, ¶ 13.

(1939), *reh. den.*, 306 U.S. 618, 59 S.Ct. 73, 83 L.Ed. 1025 (1939); *Schmidinger v. Welsh*, 383 F.2d 455 (C.A.3, 1967), *cert. den.*, 390 U.S. 946, 88 S.Ct. 1031, 19 L.Ed.2d 1134 (1968); *Johnson & Johnson v. W. L. Gore & Associates*, 436 F.Supp. 704 (D.Del.1977); *Jones v. O. A. Newton & Son Co.*, 317 F.Supp. 705 (D.Del.1970).

■ It is axiomatic that a court, in determining whether or not a patent has been infringed, must look first to the claims of the patent and if the "accused matter falls clearly within the claim, infringement is made out and that is the end of it." *Graver Manufacturing Co. v. Linde Co., supra*, 339 U.S. at 607, 70 S.Ct. at 855. In cases such as the present one, however, where there is extensive prior art, and where the Patent Office has, in the course of its prosecution of the patent in suit, forced the patentee to narrow his claims in order to distinguish them from the prior art and thus save them from invalidity, the claims must be interpreted narrowly in light of the limitations imposed by the Patent Office. *Graham v. John Deere Co., supra*, 383 U.S. at 33–34, 86 S.Ct. at 701–02; *MacKay Radio & Telegraph Co. v. Radio Corporation of America, supra*, 306 U.S. at 102, 59 S.Ct. at 434; *Schmidinger v. Welsh, supra*, 383 F.2d at 462–64; *Jones v. O.A. Newton & Son, Co., supra*, 317 F.Supp. at 709. Moreover, after a patentee has so limited his claims "and persuaded the Patent Office to grant his patent on the clear representation that these limitations were material and patentably distinguished his ... device from the prior art," under the doctrine of "file wrapper estoppel" he may not, in a later action for infringement either enlarge his claims so as to recoup the broader claims surrendered in the Patent Office prosecution or "reverse his position and contend that the same limitations are immaterial." *Jones v. O. A. Newton & Son Co., supra*, 317 F.Supp. at 709. *See also Graham v. John Deere Co., supra*, 383 U.S. at 33–34, 86 S.Ct. at 701–02.[29]

■ When the claims of the '320 patent are interpreted in light of these principals and the limitations imposed during the patent's prosecution before the Patent Office,[30] it is clear that Modern Maid's Wisp–Air Vent System does not infringe "beyond question" the very limited claims that remained after that prosecution.

Claim 1 is the only independent claim of the '320 patent. If that claim is not infringed by the Wisp–Air Vent System, none of its other claims will be infringed. Claim 1,[31] broken into sub–paragraphs, claims the following:

1. For use with a cooking range of the type having a horizontal surface and at least one series of substantially aligned heating elements positioned thereon for cooking purposes, the combination thereof with apparatus for capturing and removing grease laden or odoriferous vapors produced while cooking on said range, said apparatus comprising

means defining an elongate air intake opening substantially flush with said surface,

said opening being in closely proximate parallel relation to and substantially longitudinally coextensive with said series of heating elements,

a plenum housing coupled to said air intake opening defining means and disposed beneath said surface,

and power driven air moving means communicating with said plenum housing for continuously drawing a high volume rate of air through said air intake opening and plenum housing and thereby create a region of negative air pressure immediately above said opening,

said negative air pressure region extending over said series of heating elements and being substantially coextensive therewith

whereby the grease laden or odoriferous vapors present in the air above said surface and said series of heating ele-

**29.** Thus, while it is true, as Jenn–Air argues, *that in other cases, infringement may not be avoided by mere changes in form that have no effect upon the material features of a patent, Reitzsch v. Paradis*, 83 F.2d 273, 274 (C.A.3, 1936); *Bendix Corp. v. United States*, 199 U.S.

P.Q. 203, 221–22 (Ct.Cl.1978), *that doctrine does not apply in cases where there is file wrapper estoppel*.

**30.** D.I. 16; D.I. 19, Ex. 21.

**31.** D.I. 6A, Ex. 1, col. 4, *ll.* 44–66.

ments is positively captured and removed through said opening and said plenum housing.

Modern Maid's Wisp–Air Vent System does not fall within these claims in several respects. First, while the '320 patent calls for "an elongate air opening," the Wisp–Air Vent System utilizes a square air intake opening measuring 5½″ × 5½″.[32] Secondly, while the '320 patent calls for an air intake opening which is parallel to and "substantially longitudinally coextensive" with the series of heating elements of the range, the 5½″ length of the Modern Maid air intake vent is centrally located and comprises only 35% of the 15½″ length of the series of heating elements.[33]

Although these apparently minor differences may seem unrelated to either function or efficiency, for the purposes of this motion for a preliminary injunction, they are dispositive of the issue of literal infringement. These minor differences relate to specific limitations which were imposed by the Patent Office in the course of the patent's prosecution in order to distinguish the '320 patent from prior art. All of the '320 patent's claims were initially rejected by the Patent Office examiner as obvious in light of Schaefer[34] when taken with Jenn.[35] The Schaefer patent shows a range with a centrally located flue which comprises an intake means adjacent to the heating elements and substantially flush with the range top. Moreover, in Schaefer, a plenum housing communicates with the intake, and a blower means operates to create a low pressure zone immediately above the intake and draws air through the plenum housing and through a filter which removes grease from the air. According to the examiner, Jenn "teaches the concept of providing an exhaust opening in a range top which opening is extended to lie adja-

cent to each heating element" and it would be obvious to incorporate this feature in Schaefer.[36]

In order to distinguish the claims of the '320 patent from those of the prior art, the inventors then substantially limited their claims by narrowly defining the nature of the air intake means. Where, in the original application, the inventors had specified an "intake means positioned substantially flush with said horizontal surface and substantially adjacent to each said heating element," they amended and limited that claim to read "means defining an elongate air intake opening being in closely proximate parallel relation to and substantially longitudinally coextensive with said series of heating elements."[37] Thus, the claim was amended to require (1) an *elongate* opening, which was (2) substantially *longitudinally coextensive* with a series of burner elements and (3) *closely proximately parallel* to that series.

The fact that the first and second of these new limitations, the two characteristics which the Wisp–Air Vent System does not share with the '320 patent, were considered crucial in order to distinguish the '320 patent from prior art is made absolutely clear by the arguments made by counsel to the Patent Office.[38] Counsel first noted that in the Schaefer patent, which disclosed a "rather small centrally disposed cylindrical flue" the intake means, among other things, was limited in efficiency because it was not elongate and thus did not extend so as to be "adjacent to the heating elements" and consequently could not efficiently capture vapors "produced at the outer peripheries of the heating elements . . . which can be at distances on the order of 18 to 20 inches from the flue." The purpose of specifying an *elongate* air opening which extended *substantially the*

32. D.I. 17, ⸢ 7.

33. D.I. 17, ⸢⸢ 7 & 11.

34. *Schaefer*, U.S. Patent No. 2,674,991 (D.I. 6A, Ex. 12).

35. *Jenn et al.*, U.S. Patent No. 3,102,533 (D.I. 6A, Ex. 2).

36. D.I. 19, Ex. 21, paper No. 5.

37. D.I. 16, p. 3; D.I. 19, Ex. 21.

38. D.I. 16; D.I. 19, Ex. 21.

*length* of a parallel set of heating elements was further spelled out in a later argument:

> When using ... arrangements such as those shown in the Schaefer and Jenn et al. patents, a real problem is encountered because it is found that the capture velocities of the air drop very rapidly as you move downwardly from the air intake port. However, it has been found that when the air intake port is located substantially flush with the heating elements and preferably equidistant therefrom the air capture velocities create a pattern which substantially envelope the cooking surfaces. With this fact in mind it will be noted upon inspection of the drawing in the present application that in the preferred embodiment the air inlet opening 20 is disposed in the plane of the heating elements and substantially equidistant from the two series 14 of heating elements 15. As a consequence, relatively high air capture velocities are maintained with much smaller blowers and much less noise.

Counsel then further distinguished the amended claims of the '320 patent from prior art in such a way as to make it even clearer that it was essential that the opening be elongate and that it be substantially the same length as ("longitudinally coextensive with") the series of burner elements:

> Referring to independent claim [1], the Examiner's attention is directed to the fact that such claim specifically defines apparatus including "means defining an elongate air intake opening substantially flush with said surface." The *Schaefer air intake openings 32 are not elongate* nor are they substantially flush with the surface of the heating elements. While the Jenn et al. intake opening is elongate, it is certainly anything but substantially flush with the surface of the heating elements. *The claim goes on to define an arrangement in which the opening is "in closely proximate parallel relation to and substantially longitudinally coextensive with said series of heating elements."*

*Again, such a construction is not found in either of the patents of record or in any other patents of which applicants are aware.* It is axiomatic in the patent law that what is not taught individually by any of the references cannot be taught by any combination thereof. *The features set forth in claim 15, the only independent claim presented in this case, are not autosuggestive.* [Emphasis added.]

Because a square opening is no more elongate than is the circular, centrally disposed flue in Schaefer and because an opening which extends 35% of the length of a series of burner elements is by no means substantially longitudinally coextensive with that series, the Court therefore concludes that the Wisp–Air Vent System does not literally infringe "beyond question" the limited claims of the '320 patent.

▮ Jenn–Air nevertheless contends that, even though the Wisp–Air Vent System may not literally infringe the '320 patent, it does infringe under the doctrine of equivalents. According to the doctrine of equivalents "if two devices do the same work in substantially the same way and accomplish substantially the same result, they are the same, even though they differ in name, form or shape" and will be treated as such for the purpose of determining infringement. *Graver Manufacturing Co. v. Linde Co., supra,* 339 U.S. at 608, 70 S.Ct. at 856. Jenn–Air argues that regardless of the exact configuration of Modern Maid's air intake opening, the opening performs the same air capturing and removing function in the same manner to produce the same result as the "elongate," "substantially longitudinally coextensive" air intake opening recited in Claim 1 and is therefore an equivalent and infringes the patent. The Court finds, however, that regardless of whether the two are equivalents Jenn–Air is probably barred from invoking the doctrine of equivalents by file wrapper estoppel. It is well–established that in cases such as the present one, where broad claims have been surrendered in order to overcome

332

prior art objections in the patent prosecution, those broad claims may not later, in an infringement action, be recaptured under the rubric of the doctrine of equivalents. As the Supreme Court held in *Schriber–Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 221, 61 S.Ct. 235, 239, 85 L.Ed. 132 (1940), *reh. den.*, 312 U.S. 714, 61 S.Ct. 727, 85 L.Ed. 1144 (1941):

> The patentee may not, by resort to the doctrine of equivalents, give to an allowed claim a scope which it might have had without the amendments, the cancellation of which amounts to a disclaimer.

*Accord, Schmidinger v. Welsh, supra*, 383 F.2d at 264–65; *Jones v. O. A. Newton & Son Co., supra*, 317 F.Supp. at 709–710.

The Court, therefore, concludes that Jenn–Air has not demonstrated infringement "beyond question." Indeed, at least for the purposes of this motion for a preliminary injunction, the Court finds it more probable than not that the Modern Maid Wisp–Air Vent System does not infringe the '320 patent. For that reason, and because it also finds that Jenn–Air has failed to satisfy its burden of showing validity "beyond question," the Court concludes that Jenn–Air has not met its burden of showing a probability of success on the merits.

### B. *Irreparable Harm*

■ The Court further finds that Jenn–Air has failed to show that it will be irreparably harmed if relief *pendente lite* is not granted. There is no doubt that Modern Maid will be able to pay any damages which may be assessed for any injury which Jenn–Air might suffer *pendente lite*. Modern Maid's current assets are almost five times its current liability and its net working capital exceeds $10,000,000.[39] Jenn–Air does not dispute Modern Maid's ability to respond in damages. Rather, Jenn–Air questions the adequacy of a damage remedy for the kinds of harm which it will suffer.

First, Jenn–Air points out that it has made a major financial commitment "to educate the trade and consumers that the patented product was operative" and thus to create a market. Jenn–Air further contends that the market is limited to those members of the consuming public who are in the market for a cooking range and any sales by Modern Maid will be at the sole expense of Jenn–Air. Thirdly, Jenn–Air argues that it will be difficult to calculate damages because the cooking range market, which follows the residential building market, will fluctuate erratically in the remaining four and one–half years of the patent's life. Finally, Jenn–Air contends that, if Modern Maid is not preliminarily enjoined, other infringers will be encouraged to enter the market forcing Jenn–Air to bring a multiplicity of lawsuits.

None of these arguments would lead this Court to believe that Jenn–Air will be unable to be adequately compensated in damages if it is ultimately successful in this action. Indeed, in *Nuclear–Chicago Corp. v. Nuclear Data, Inc.*, 465 F.2d 428 (C.A.7, 1972), the Seventh Circuit Court of Appeals found, in a patent case, that injuries substantially identical to those alleged by Jenn–Air here could be adequately compensated by damages and concluded that no irreparable injury had been shown. Where an alleged infringer is sufficiently solvent to meet any potential damages, irreparable injury will rarely be found in an action alleging patent infringement. *Nuclear–Chicago Corp. v. Nuclear Data, Inc., supra*; *Heyman Manufacturing Co. v. Electrix Corp.*, 200 F.Supp. 217 (D.R.I.1961); *Tyrolean Handbag Co. v. Empress Hand Bag, Inc.*, 122 F.Supp. 299 (S.D.N.Y.1954); *Collins v. Wallin*, 66 F.Supp. 687 (D.Mass.1946). In the majority of cases cited to this Court where irreparable injury has been found in a patent action, the infringer was either in bankruptcy or so financially insecure that there was serious doubt as to its ability to pay any damages that might be caused by its infringement. *Eli Lilly & Co. v. Premo*

---

**39.** D.I. 17, ¶ 17.

*Pharmaceutical Laboratories, Inc., supra; Carter–Wallace, Inc. v. Davis–Edwards Pharmacal Corp., supra; Zenith Laboratories, Inc. v. Eli Lilly & Co., supra. Contra, Teledyne Industries, Inc. v. Windmere Products, Inc., supra; Eli Lilly & Co. v. Generix Drug Sales, Inc.,* 324 F.Supp. 715 (S.D.Fla.1971), *aff'd in part and vac. in part,* 460 F.2d 1096 (C.A.5, 1972).[40]

This Court is convinced that the injury alleged by Jenn–Air can be adequately compensated by monetary damages. First, Jenn–Air is not being damaged because it expended large sums of money to create and expand the market for its product; any injury would flow solely from the fact that it would lose sales to Modern Maid. Any lost profits from lost sales that might occur *pendente lite* could readily be determined and the existence of a limited market would make it easier *to make such a determina*tion rather than more difficult. The erratic nature of the market is also irrelevant, since damages will be assessed for past infringement at the time the Court reaches the final merits of this case, and, in any case, the erratic behavior of the market would not make it impossible for a court to determine reasonable damages for even those injuries which might occur in the future (*e. g.,* lost market share in the first years after the patent's expiration). Finally, if others are encouraged by Modern Maid's success and do infringe the '320 patent, Jenn–Air has an adequate remedy in damages against them.

### C. Harm to Others and the Public Interest

The other two factors which the Court must consider in determining whether or not to grant a preliminary injunction, the effect upon third parties and the public interest, do not favor either party. No third party will apparently be affected and the public interests favoring each party appear to be evenly balanced.

Consequently, because the Court has concluded that Jenn–Air has failed to demonstrate that it will probably succeed on the merits, has shown no injury which could not be compensated adequately with damages, and has shown no other reasons which would lead this Court to conclude that a preliminary injunction ought to issue as an equitable matter, Jenn–Air's motion for a preliminary injunction will be denied.

### II. Motion for a Judgment on the Pleadings

■ Jenn–Air has also moved for a judgment on the pleadings with respect to two paragraphs contained in Modern Maid's Second Counterclaim on the ground that paragraphs 14 and 18 fail to state a claim upon which relief can be granted.[41] Rule 12(c), F.R.Civ.P. Jenn–Air contends that those paragraphs constitute claims for malicious prosecution and further maintains that because Modern Maid has alleged no facts showing (1) that the litigation in question had terminated at the time of filing the claim and (2) that the litigation had terminated favorably to Modern Maid, Modern Maid has failed to plead all the essential elements of the tort of malicious prosecution. *See La Salle National Bank v. 222 East Chestnut Street Corp.,* 267 F.2d 247 (C.A.7, 1959), *cert. den.,* 361 U.S. 836, 80 S.Ct. 88, 4 L.Ed.2d 77 (1959); *United States v. Levering,* 446 F.Supp. 977 (D.Del.1978).

The Court finds that Jenn–Air's present motion is founded upon a mischaracterization of the nature of Modern Maid's Second Counterclaim and the allegations contained therein. Modern Maid has made no claim of malicious prosecution. Its Second Coun-

**40.** The *Teledyne* case is distinguishable because, there, the Court also found that the plaintiff would probably succeed on the merits on a claim of unfair competition and found that there would be irreparable damage to plaintiff's reputation since purchasers would suffer dissatisfaction because of the inferior quality of defendant's products and attribute their dissat-

isfaction to the plaintiff. The court in *Generix* made no findings in regard to the inability of the defendant infringers to pay any potential damages, and absent such inability, this Court doubts the validity of the *Generix* court's conclusion that irreparable injury was present.

**41.** D.I. 13.

**334**

terclaim is a claim for unfair competition.[42] Specifically, Modern Maid has alleged that Jenn–Air has undertaken a course of activity having the primary objective of restraining and excluding legitimate competition by Modern Maid and other manufacturers of cooking ranges. As a part of this course of activity, Modern Maid alleges that Jenn–Air has maliciously intimidated and harassed defendant and its customers and potential customers by, *inter alia*, maliciously bringing the present action, making disparaging statements about Modern Maid and its products, by unfairly publicizing the present action, and by threatening to terminate or otherwise to interfere with the availability of Modern Maid's cooking ranges and supply parts therefor. Paragraphs 14 and 18 are simply allegations to the effect that Jenn–Air acted with malice in bringing the present action. In essence, they allege that despite its knowledge that defendant's product did not infringe the '320 patent and despite its knowledge that the '320 patent was invalid, Jenn–Air instituted this suit. They are factual allegations supporting Modern Maid's contention that this suit was brought for the sole purpose of restraining competition. If the allegations contained in Paragraphs 14 and 18 are true, which the Court must assume for the purposes of a motion for a judgment on the pleadings, 2A Moore's Federal Practice, ¶ 12.15, pp. 2343–44, they would lend support to a finding that Jenn–Air was engaging in unfair competition.[43] *See General Cellulose Co. v. Whitestone Products,* 20 F.R.D. 101 (E.D.N.Y.1956); *International Industries and Developments, Inc. v. Farbach Chemical Co., Inc.,* 145 F.Supp. 34 (S.D.Ohio 1956), *aff'd,* 241 F.2d 246 (C.A.6, 1957); *Stadium Manufacturing Co., Inc. v.*

*Plymouth Pajama Corp.,* 24 F.Supp. 779 (D.Mass.1938). For the foregoing reasons, Jenn–Air's motion for Judgment on the Pleadings must be denied.

An Order will be entered in accordance with this Opinion.

---

**42.** D.I. 17, ' 10. The Court has jurisdiction over Modern Maid's Second Counterclaim pursuant to 28 U.S.C. § 1338(b).

**43.** Jenn–Air, relying on *Goodyear Tire & Rubber Co. v. Marbon Corporation,* 32 F.Supp. 279 (D.Del.1940), also argues that the two allegations of "malicious prosecution" should be dismissed because they are premature until such time, if ever, that Modern Maid should prevail in the principal claims of the present suit. The *Goodyear* case apparently dealt solely with a counterclaim for malicious prosecution and

consequently is irrelevant to the present issues. Modern Maid has not alleged that the commission of the tort of malicious prosecution was part of Jenn–Air's scheme of unfair competition but has alleged that the filing of the present suit with malicious intent was part of that scheme. Because the injurious act, the filing of the suit, has already been completed and injuries have and still are flowing from that act, the Court can see no reason for finding the allegations premature (if, indeed, mere allegations can be stricken for being premature).