James GERITY, Jr., on behalf of himself and all others similarly situated, Plaintiffs,

v.

CABLE FUNDING CORP. et al., Defendants.

Civ. A. No. 4720.

United States District Court, D. Delaware.

Nov. 6, 1973.

Irving Morris, of Cohen, Morris & Rosenthal, Wilmington, Del., Stuart D. Wechsler, Samuel K. Rosen, and Robert S. Churchill, of Kass, Goodkind, Wechsler & Gerstein, New York City, for plaintiffs.

Rodman Ward, Jr., of Prickett, Ward, Burt & Sanders, Wilmington, Del., Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Cable Funding.

R. Franklin Balotti, of Richards, Layton & Finger, Wilmington, Del., W. Foster Wollen and Robert S. Blanc, III, of Shearman & Sterling, New York City, for defendant White, Weld & Co.

Bruce M. Stargatt, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., Jack C. Auspitz, of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for individual defendants.

Charles F. Richards, Jr., of Richards, Layton & Finger, Wilmington, Del., Clark, Thomas, Denius, Winters & Shapiro, Austin, Tex., for defendants Communications Properties, Inc., and Telesystems Corp.

Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, Del., Stephen B. Camhi, and Daniel S. Greenfeld, of Marshall, Bratter, Greene, Allison & Tucker, New York City, for Geneve Corp.

## OPINION

STAPLETON, District Judge:

This is a class action brought to redress alleged violations of the 1933 and 1934 Securities Acts. Presently before the Court is plaintiff's motion for a preliminary injunction. The injunction sought would prevent defendant Cable Funding Corporation, pending a final disposition of the case, from making any substantial change in the deployment of its assets.

Cable Funding Corporation ("Cable") is a Delaware corporation. Plaintiff is the owner of 5,000 shares of Cable common stock, purchased during Cable's initial public offering in August of 1972. This suit was commenced in the Southern District of New York on July 11, 1973. Then and now, the named defendants are Cable; certain of its individual directors and officers; White, Weld & Co., the managing underwriter for Cable's public offering; and Communications Properties, Inc. and its subsidiary, Telesystems Corp. The complaint alleged that the latter two defendants were then negotiating a loan from Cable.

In his complaint, plaintiff sought rescission of his purchase of Cable stock under Section 12(2) of the Securities At of 1933, damages under Section 11 of that Act, the appointment of a receiver to wind up Cable's business, liquidate its

assets and distribute the proceeds therefrom to its shareholders, damages pursuant to Section 10(b) of the Securities Act of 1934, damages for common law fraud, and an injunction restraining the proposed transactions between Cable and Communications and Telesystems.

In late July, 1973, two corporations mounted competing tender offers for controlling blocs of Cable stock. The first such tender was made by Coaxial Communications, Inc. This tender was enjoined by a temporary restraining order issued by this Court on August 7. The following day, plaintiff in this action moved in the Southern District of New York for orders joining the second tendering corporation, Geneve Corporation ("Geneve") as a defendant and requiring it to show cause why its offer should not likewise be enjoined. Simultaneously, Coaxial attempted to obtain from this Court identical relief against the Geneve tender. On August 14, Judge Carter of the Southern District denied, without prejudice and without passing upon their merits, plaintiff's motions to join Geneve and to enjoin its tender. The Court then granted Cable's motion to transfer the venue of this action to the District of Delaware. Shortly thereafter, this Court also refused to restrain the Geneve tender. Although the Geneve tender has been successfully completed, plaintiff maintains his underlying action against Cable and now seeks both injunctive relief against Cable and the addition of Geneve as a defendant.

## THE FACTUAL BACKGROUND

To understand the present posture of this case, it is necessary to briefly review the history of Cable since its inception as a publicly held corporation.

Cable was, in the words of the prospectus accompanying its initial offering, organized "to be principally engaged in the business of making loans to cable television companies to finance the construction and start-up of new cable television systems and the construction of additions to or modifications of existing cable television systems." In late August of 1972, Cable made a public offering of 1,000,000 shares of its common stock at an initial offering price of $15 per share. Since that time, Cable has committed approximately $1,750,000 in loans to cable television systems. The remainder of Cable's assets have remained in a highly liquid form and are invested principally in certificates of deposit issued by various banks.[1]

In a letter to shareholders dated April 18, 1973, Cable's president, Harold Ewen, sought to explain Cable's relative inactivity in its projected area of investment operation. Stressing the stiff competition Cable faced from other lending sources and its consequent inability to place loans on favorable terms, Ewen concluded that it was inadvisable for Cable to remain primarily in the lending business. Accordingly, he announced that Cable's management would begin investigating either acquiring or merging with multiple operating cable systems.

Soon thereafter, Cable announced that it was engaged in discussions with Communications Properties and its subsidiary, Telesystems concerning a $7,500,000 loan by Cable to Telesystems and a combination of Communications and Cable. Plaintiff then instituted this suit. Negotiations between Cable and Communications and Telesystems soon proved fruitless, however, and were abandoned. Since the collapse of these negotiations, Cable has neither placed additional loans nor effected a combination with any other company, within or without the cable television business.

On August 3, while the competing tenders of Coaxial and Geneve were at their height, Mr. Ewen informed the shareholders that changing market conditions once again made lending a viable investment activity and that Cable's management was, therefore, re-focussing its efforts in that direction.

---

1. According to plaintiff there are "approximately $13,500,000 in highly liquid assets . . . available to Cable shareholders in the event of liquidation." Pl. Br. p. 7.

Simultaneously, however, Geneve was tendering for Cable shares on the basis of distinctly different expectations for Cable's future. In its tender statement, Geneve disclosed its intention to "make a major change in the business of Cable, as set forth in the prospectus of August 22, 1972 of Cable, in that Cable would no longer principally be engaged in the business of making loans to cable television companies." In addition, Geneve indicated as follows:

Geneve has been organized to seek out, purchase and control selected new and existing business enterprises offering the opportunity for substantial long-term growth. In the event Geneve assumes control of Cable it will cause Cable primarily to seek investments in businesses where Cable can exert significant influence on their structure, management and operation. Toward this end, Geneve will attempt to cause Cable to purchase controlling interests in or complete ownership of operating businesses . . .

Geneve has not yet formulated any plans with respect to specific applications of Cable's assets.

Geneve's successful tender gained it 37.5% of Cable's outstanding stock. At present, however, there is no nominee of Geneve on the Cable board. Cable's stockholders will meet on November 19th of this year, and, at that time, Geneve will be able to seek board representation.

## PLAINTIFF'S ARGUMENT FOR A PRELIMINARY INJUNCTION

Geneve's successful tender, with its avowed goal of transforming Cable's business purpose, has apparently exacerbated plaintiff's anxiety about Cable's future. He now seeks a preliminary injunction allegedly because of the fear that the investment program on which Geneve promises to embark will render Cable's assets illiquid and thus make more difficult recovery on any judgment plaintiff may ultimately secure against Cable on behalf of himself and the class he purports to represent.

In support of the injunctive relief he seeks, plaintiff relies solely on Sections 11 and 12(2) of the Securities Act of 1933. He asserts that Cable violated these sections by issuing a materially misleading prospectus in connection with its initial public offering. That prospectus was materially misleading, plaintiff alleges, because it did not disclose the substantial risk that the business purpose it announced—the making of loans to cable television franchises—might prove impossible to accomplish and that, therefore, Cable's management might pursue alternative investment opportunities.[2]

To remedy these alleged violations of the Securities Act, plaintiff ultimately seeks rescission of the purchases he and his fellow shareholders made of Cable stock pursuant to Cable's prospectus. Alternatively, he seeks the liquidation of Cable. Neither form of redress, plaintiff believes, can be effective unless this Court acts now to preserve Cable's assets in their presently liquid state. He, therefore, urges that this Court exercise its injunctive powers so as to foreclose any substantial reinvestment of Cable's assets until the outcome of this suit.[3]

2. Plaintiff does not maintain that the present record demonstrates a different intention on the part of Cable's management in August of 1972 than that expressed in the prospectus. Rather his argument is that Cable's management knew or should have known, and, therefore, should have disclosed, the alleged fact that competitive conditions at the time of the issuance of the prospectus created a substantial risk that the expectations of management could not be realized. Cable's management denies that it had any intentions other than those expressed and main-

tains that the prospectus adequately disclosed what could have been known about competitive conditions in its contemplated field of business endeavor.

3. While plaintiff has not submitted a form of order setting forth the specific terms of the preliminary injunction he seeks, plaintiff's objective, as outlined in oral argument, would be to require that Cable maintain its current level of liquidity by retaining its current investments or by reinvesting its currently liquid assets in government obligations or the like.

## THE PROPRIETY OF PRELIMINARY RELIEF.

▆▆▆ The relevant questions are, of course, familiar: Has the plaintiff demonstrated a reasonable probability of success on the merits of his underlying claim? Is there a likelihood of irreparable injury to the plaintiff or the public absent judicial interference? If so, does the likelihood of irreparable injury to the defendant, the public or third parties from such interference outweigh the potential injury against which the preliminary relief would seek to guard? Winkleman v. New York Stock Exchange, 445 F.2d 786 (3rd Cir. 1971); Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc., 414 F.2d 506 (3rd Cir. 1969); Nelson v. Miller, 373 F.2d 474 (3rd Cir. 1967); Elco Corporation of Microdot, Inc., 360 F.Supp. 741 (D. Del.1973).

While courts have sometimes differed⁷ in their articulation of the relationship between these inquiries, the cases unanimously support the proposition that preliminary injunctive relief is improper, regardless of the plaintiff's showing on the merits, unless it is demonstrated that there is a potential of irreparable injury to the plaintiff if unaided by the Court, and that this potential of injury together with any similar potential of injury to the public is not outweighed by the potential of injury to others if relief is granted. In short, the "balance of hardships" must favor the plaintiff's position or relief must be denied. Checkers Motors Corporation v. Chrysler Corporation, 405 F.2d 319, 323 (2nd Cir. 1969).

Since I am unpersuaded that the balance of hardships favors the plaintiff in this case, I will address myself only to that issue.

At the outset, it is important to stress several factors which, taken together, distinguish this case from any previous case in which preliminary relief resembling the kind here sought has been granted.

▆▆▆ First, Cable is a solvent corporation with a currently functioning management elected by its stockholders. Its shares have been publicly traded for fourteen months. Its net worth apparently substantially exceeds the amount which would be required to satisfy any judgment which is reasonably foreseeable in this case.⁴ At the very least, no affirmative showing has been made that Cable's present assets less its liabilities would be inadequate for this purpose.⁵

---

4. While plaintiff asks the liquidation and dissolution of Cable as an alternative to rescission or damages, that form of relief is a highly extraordinary one and would not appear on the present record to be appropriate. Thus, I need not decide whether such relief is authorized under Sections 11 and 12 of the 1933 Act. Moreover, the members of plaintiff's purported class would appear to have more potential for benefit through rescission or damages than through liquidation and dissolution. Accordingly, I have evaluated the balance of hardships in this case upon the assumption that rescission or damages would be the appropriate relief in the event the merits of plaintiff's claim are established.

5. One million non-subordinated shares of Cable common stock were sold to the public pursuant to the August 1972 offering. The purchasers paid $15 per share. The latest financial data in the record indicates that the net worth of Cable, as of May 31, 1973, was about $13,500,000. Assuming that the plaintiff is ultimately awarded rescission of his purchase, he will be entitled to $15 a share upon an appropriate tender. (The record reflects no interim distributions on these shares). Others in the class plaintiff claims to represent (i. e. all who purchased in the original offering and all who purchased within 90 days thereafter) who still hold their Cable stock may also be entitled to $15 per share upon rescission. However, a substantial number of the shareholders in this class have sold their shares. Public trading has occurred throughout the period and we know that Geneve now holds shares constituting approximately 37.5% of the total outstanding shares. All of Geneve's shares are unsubordinated shares issued in the original offering. Shareholders in plaintiff's class who have subsequently sold shares would only be entitled to damages measured by the difference between the purchase price of their shares and the market price when they sold (or possibly in some instances, on the date the suit was filed). Geneve paid $12 per share for its shares; the current record does not indicate that Cable's unsubordinated

Second, plaintiff does not assert that any provision in the Securities Act forbids Cable from now employing its assets in a manner inconsistent with plaintiff's construction of the intentions expressed in the prospectus.[6] Plaintiff does not seek to restrict Cable to the business of making loans to cable television companies; indeed, the injunction sought would preclude pursuit of that activity by Cable. Rather, plaintiff's position is (1) that the August 1972 prospectus violated the Securities Act, (2) that he and those similarly situated Cable stockholders who so elect are entitled to rescission or damages and (3) that this Court should freeze the assets of Cable to assure that funds will be available to make those remedies meaningful.

Third, plaintiff does not and could not successfully maintain at this point that he had demonstrated the likelihood of waste, deliberate dissipation of assets, looting or other mismanagement by the current management, or by any potential management, of Cable.[7]

It is in this context that the balance of hardships must be struck. The most that can be said for plaintiff's side of this balance is (1) that if Cable is allowed to convert its assets into less liquid investments, the task of realizing upon any final judgment may become more complex and (2) that there is a possibility, though certainly no demonstrated probability, of business losses during the litigation period which would frustrate full recovery.

On the other side of the balance, we face the certainty that a preliminary injunction of the type plaintiff seeks would preclude the elected management of Cable from exercising any further business judgment in the deployment of its assets and would deprive the present shareholders of Cable of the benefit of any investment opportunity which may present itself during the pendency of this lawsuit. Conditions in any area of business endeavor are subject to change. Change necessitates reevaluation and frequently action. This process is properly the responsibility of management and should not be foreclosed by Court intervention in the absence of far more compelling circumstances than here appear.

While the facts before this Court in Bowers v. Columbia General Corporation, 336 F.Supp. 609 (1971) were somewhat different and the problems of effectuating a rescission remedy far more substantial, the following observations were made in that case which are also appropriate here:

> . . . [W]here it appears that the court can allow a business to be managed by its board of directors and still do substantial justice if and when the time for rescission comes, it should not restrict management by prelimi-

---

common stock has ever sold for less than $5 per share. According to plaintiff, it is now selling for approximately $7 per share. It is true that one cannot currently predict the maximum dollar exposure of Cable in this context. The amount of the total recovery might vary, of course, depending not only upon the facts developed at trial but also upon which section of the Securities Act recovery might be predicated. One can conclude with some assurance from the present record, however, that the exposure of Cable is substantially less than its current net worth.

6. While an argument could perhaps be made that effectuation of the purposes of Sections 11 and 12 in some factual situations would require that the issuer restrict its activities to its originally stated business purpose,

that was clearly not the legislative goal. Where rescission or damages appear adequate to render purchasers whole, nothing in those sections expressly or impliedly suggests that the prospectus rather than the corporate charter be taken as delineating the permissible scope of business endeavor.

7. While plaintiff maintained in his opening brief that the Cable "management has manifested total disregard for its fiduciary obligations to Cable's shareholders," his reply brief claims only that he "has shown . . . that the threatened event is reasonably likely, namely that Cable's assets will be rendered illiquid (not 'wasted' as Cable suggests in misrepresenting plaintiff's position)." This position was reasserted at oral argument.

nary order for the purpose of freezing the corporation's assets and the form of its business operations. The powers of a court of equity are sufficient to make this unnecessary. 3 Black, Rescission and Cancellations, §§ 616, 633, 688 and 689 (2 ed. 1929); cf. J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

. . .

[The] stockholders have a substantial interest in having the affairs of . . . [the defendant corporation] managed by its board of directors. While the interests of the [corporation's] board are not identical to those of the plaintiffs, these men do have an interest in seeing . . . [the corporation] survive and prosper, and, of course, are accountable to plaintiffs and the other stockholders . . . for any breach of their duty in this regard. Unless and until it is shown that an imminent transaction will foreclose this Court from doing substantial justice by way of rescission, I believe the management of . . . [the corporation] should be left to pursue their fidicuary duties unfettered by Court order.

In the present case plaintiff seeks relief in the form of cash; the present net worth of the corporation appears sufficient to cover any potential recovery; and no likelihood of waste or mismanagement has been shown.[8] In this context it is difficult to see how any imminent transaction, short perhaps of dissolution, might foreclose this Court from doing substantial justice by way of rescission or damages should the need arise. In any event, no such danger appears in this record.

The balance of hardships clearly does not tip in plaintiff's favor. The preliminary relief sought will be denied.[9]

8. In no case to which the Court has been referred has a preliminary injunction been issued to conserve corporate assets for final judgment without some showing of mismanagement, fraud or impending waste. Indeed, the decisions cited by the plaintiff serve to undermine, rather than support, his position. Without exception, they endorse injunctive relief to conserve corporate assets pending final recovery only where managerial misfeasance creates a real and immediate risk that those assets will be dissipated. In Orth v. Transit Investment Corporation, 132 F.2d 938, 944–945 (3rd Cir. 1942), the court indicated that an injunction is appropriate to prevent "[the] threatened diversion or loss of assets by the fraud or mismanagement of [the defendant's affairs]." In Skirvin v. Mesta, 141 F.2d 668, 673 (10th Cir. 1944), the court authorized preliminary relief to preserve the corporate assets in the face of allegations of fraud, collusion and mismanagement and because of the "danger of the property being lost with a result of diminution in value of the stock." In S.E.C. v. Fiscal Fund, 48 F.Supp. 712 (D.Del.1943), the court granted, among other remedies, an injunction where it was "barely possible to detect the faint beating of the corporate pulse, where failure of management is obvious, and failure of corporate purpose is permanent and irremediable." At 715. Finally, in Deckert v. Independence Corporation, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940), the Supreme Court, in a suit to rescind allegedly fraudulent stock purchases, upheld a lower court injunction against the use of corporate assets because the defendant was "insolvent and its assets in danger of dissipation or depletion."

9. Plaintiff has also moved for leave to file an amended complaint joining Geneve and others as defendants. This application will be granted. By this ruling, however, the Court expresses no opinion regarding the sufficiency of any portion of the amended complaint. If they so desire, the additional defendants may move to dismiss. Since those defendants have briefed and argued various attacks on the amended complaint, no additional briefing or argument will be required of them in the event they move to dismiss. However, if a motion for dismissal is filed and within seven days thereafter the plaintiff informs the Court of a desire to further brief these matters, an appropriate schedule will be set and the additional defendants will be afforded the opportunity to reply. Counsel should also confer and attempt to reach an agreement on a schedule for disposition of the pending motions of Cable and the Cable directors who are already parties to this suit.