**ROHM AND HAAS COMPANY,**
Plaintiff,

v.

**MOBIL OIL CORPORATION and
Rhone-Poulenc, Inc., Defendants.**

**MOBIL OIL CORPORATION and
Rhone-Poulenc, Inc., Plaintiffs,**

v.

**ROHM & HAAS COMPANY, Defendant.**

Civ. A. Nos. 78–384, 79–397.

United States District Court,
D. Delaware.

Nov. 12, 1981.

---

Rudolf E. Hutz and James M. Mulligan of Connolly, Bove & Lodge, Wilmington, Del., and George W. F. Simmons and William E. Lambert, III, of Rohm & Haas Company, Philadelphia, Pa., of counsel, for Rohm and Haas Company.

Edward M. McNally of Morris, James, Hitchens & Williams, Wilmington, Del., and John A. Diaz, J. Robert Dailey, Arnold I. Rady, New York City, and James W. Gould, Philadelphia, Pa., Morgan, Finnegan, Pine, Foley & Lee, New York City, of counsel, for Mobil Oil Corp. and Rhone-Poulenc, Inc.

## OPINION

LATCHUM, Chief Judge.

In Civil Action No. 78–384, plaintiff Rohm and Haas Company ("Rohm & Haas") seeks a declaratory judgment that a patent held by defendant Mobil Oil Company ("Mobil"), United States Patent No. 3,979,437 ("437 patent"), is invalid, unenforceable and not infringed. (Docket Item ["D.I."] 1.) Mobil has counterclaimed for infringement and seeks treble damages against Rohm & Haas. (D.I. 14.) After commencement of this action, Mobil filed an application for reissue of the 437 patent with the Patent and Trademark Office ("PTO") pursuant to 37 C.F.R. § 1.171 *et seq.* and moved to stay this litigation pending the outcome of the PTO proceeding. (D.I. 11.) On December 12, 1978, the Court granted Mobil's motion to stay but permitted Rohm & Haas to take certain limited discovery regarding some of the issues which would come before the PTO. *Rohm and Haas Co. v. Mobil Oil Corp.*, 462 F.Supp. 732 (D.Del.1978). The PTO subsequently rendered a decision substantially upholding the validity of the 437 patent and rejecting *in toto* Rohm & Haas' contentions of prior art and fraud in the procurement of the patent. Mobil has now moved for a preliminary injunction prohibiting Rohm & Haas from further infringement of Mobil's 437 patent. (D.I. 38.) Rohm & Haas opposes this motion and has moved in turn to consolidate this action with Civil Action No. 79–397, another patent infringement suit brought by Mobil against Rohm & Haas involving the same network of patents and patent applications pertinent to the present suit. (D.I. 46.) For the reasons discussed in this opinion, the Court concludes that a preliminary injunction is not warranted, and that consolidation of this action with Civil Action No. 79–397 will be allowed.[1]

## I. *Background of the Dispute*

Both Mobil and Rohm & Haas hold patents on certain diphenyl ether compounds which can be used as herbicides. Since April, 1980, when it received EPA approval for its product, Rohm & Haas has manufactured and marketed a diphenyl ether herbi-

---

1. On July 31, 1981, Rhone-Poulenc, Inc., a New York corporation, purchased Mobil's entire agricultural chemical division, including the patents at issue in both proceedings pending in this Court. Consequently, by stipulation of the parties and with the approval of the Court, Rhone-Poulenc, Inc., was added as a party-de-fendant to C.A. No. 78–384 (D.I. 85), and as a party-plaintiff to C.A. No. 79–397 (D.I. 43). Because these actions have either been defended or prosecuted entirely by Mobil and its attorneys to date, however, this opinion will refer only to Mobil as the operative party.

cide under the trade name "Blazer." Blazer is a post-emergence selective herbicide licensed for use in soybean farming operations and is presently enjoying widespread domestic application. Mobil's 437 patent embraces a category of generic diphenyl ether compounds that includes certain of the Blazer compounds[2] and Mobil recently began to manufacture its own diphenyl ether herbicide under the trade name "Tackle." Although Tackle is substantially similar in content to Blazer, it is not currently marketed in the United States and can only be sold abroad. Mobil only recently received an experimental use permit from the EPA to test Tackle on approximately 5000 acres of soybean in the United States and Tackle purportedly is at least a few years from full commercial licensing in this country.

Because of the similar product chemistry of Tackle and Blazer, the patents underlying these herbicides are said to stand in a classic blocking situation in which neither Mobil nor Rohm & Haas can sell its product without infringing the other's patent. In fact, Rohm & Haas has stipulated that if Mobil's 437 patent is deemed valid and enforceable, it has been infringed by Blazer. (D.I. 36.) The dispute thus centers on the validity of the 437 patent, particularly in light of the alleged prior art existing at the time of its issuance.

Both parties agree that the validity of the 437 patent will ultimately depend on the Court's determination of the appropriate filing date of the underlying patent application. Although the 437 patent application was actually submitted to the PTO on September 29, 1975, Mobil contends that this application was a "continuation" of a prior Mobil application filed on February 11, 1971 and, therefore, was entitled to the benefit of the 1971 filing date under 35 U.S.C. § 120.[3] If Mobil is not entitled to the 1971 filing date for its 437 patent, the patent in all likelihood would be invalid because of prior art contained in a Rohm & Haas patent application covering Blazer compounds, which was published in the Netherlands in 1973, and a Rohm & Haas United States Patent No. 3,798,276 ("276 patent"), issued in March, 1974, which also allegedly encompassed certain diphenyl ether Blazer compounds.

The invention described in the Mobil 1971 application was a single empirical formula embracing a broad class of potential compounds. The written specification described 26 working examples of typical chemical compounds included within the invention and 57 other "non-limiting examples," and concluded with certain claims. The 1975 application which gave rise to the 437 patent contained the exact same specification as the 1971 application, but had different claims. Claim One of the 1975 application included certain of the Blazer compounds.

Rohm & Haas contends that even under conservative calculations the 1971 disclosure described some 15 trillion compounds and thus failed to meet the requisite specification requirements outlined in 35 U.S.C. § 112.[4] The 1971 application, according to

---

2. The "Blazer compounds" are a narrow class of herbicidal agents, including acids, esters and salts, which are characterized by a single precise formula and certain common chemical substituents. (D.I. 63 at 14; D.I. 79 at 2.) The active ingredient of Rohm & Haas' Blazer herbicide is a salt form. (Id.).

3. 35 U.S.C. § 120 as existing in 1975 provided:
*Benefit of earlier filing date in the United States*
An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

4. Under 35 U.S.C. § 111, an application for a patent must contain a specification as prescribed in 35 U.S.C. § 112. This section, as existing in 1971 and 1975, provided in pertinent part:
The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to

Rohm & Haas, essentially contained a "covetous structural formula" designed to encompass any conceivable permutation of chemicals. None of the claims contained in the 1971 disclosure was addressed to Blazer compounds and Mobil purportedly was not aware of their existence until it reviewed a copy of the Rohm & Haas Netherlands application. Thereafter Mobil manufactured and tested for the first time the compounds described in that application, discovered their excellent herbicidal activity, and filed the 437 patent application as a continuation of the 1971 application in an effort to gain the benefit of the earlier filing date and preempt Rohm & Haas' invention. Rohm & Haas thus contends that the 1971 disclosure was hopelessly overbroad and indefinite and could not properly support the claims contained in the 437 patent application. In addition, Rohm & Haas argues that in procuring the 437 patent and subsequent related patents, Mobil fraudulently concealed from the PTO certain highly relevant information, including the prior art contained in the Netherlands application and the fact that Mobil had never synthesized or tested for herbicidal activity any of the compounds covered by Claim One of the 437 patent application, until after discovery of the Netherlands application.

In response, Mobil contends that the generic formula described in the 1971 and 437 patent applications adequately supports Claim One of the 437 patent and denies any efforts on its part to conceal information from the PTO. The PTO Examiner in the reissue proceeding substantially agreed with Mobil, finding that the 437 patent specification was sufficiently clear to enable a person of ordinary skill in the art to recognize and reproduce the invention without undue experimentation. (D.I. 40A at 246–49.) He further found that Claim One of the 437 patent was "subgeneric" with respect to the 437 application disclosure and was adequately supported by the specifica-

tion. (*Id.*) Because the 1971 application and the 437 application contained the exact same disclosure, moreover, the Examiner found that the latter application was entitled to the 1971 filing date and Rohm & Haas' Netherlands application and 276 patent, therefore, could not be considered prior art. (D.I. 40A at 249–50.) Finally, the Examiner concluded that Mobil's failure to test any of the Blazer compounds for herbicidal activity prior to the filing of its 437 patent application was irrelevant since federal law does not require a patentee actually to reduce the claimed invention to practice. (D.I. 40A at 332.) Based largely on the Examiner's report, the Assistant Commissioner of Patents, who is entrusted with responsibility for examining allegations of fraud or deception in the patenting process, concluded that there was insufficient evidence of inequitable conduct with respect to Mobil's procurement of its 437 patent to strike the reissue application. (D.I. 40A at 550.)

II. *Motion for Preliminary Injunction*

As this Court has recently observed, the standard for granting a preliminary injunction against infringement of a patent is unusually stringent. *Jenn-Air Corporation v. Modern Maid Company*, 499 F.Supp. 320, 322 (D.Del.1980), *aff'd without opinion*, 659 F.2d 1068 (C.A.3, 1981). In patent cases, the courts generally have abandoned the traditional equity rule requiring a showing of likelihood of success as a prerequisite to preliminary injunctive relief in favor of a heavier burden which requires the movant to demonstrate that the patent is "beyond question" valid and infringed. *Id.* at 322; *see Mayview Corporation v. Rodstein*, 480 F.2d 714, 717 (C.A.9, 1973); *Bose Corporation v. Linear Design Labs, Inc.*, 467 F.2d 304, 307 (C.A.2, 1972); *Eli Lilly & Co. v. Generix Drug Sales, Inc.*, 460 F.2d 1096, 1099 (C.A.5, 1972); *Frommelt Industries v. W. B. McGuire Co.*, 504

---

enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

F.Supp. 1180, 1184 (N.D.N.Y.1981). Besides satisfying this unique and substantial burden, the moving party must additionally make the conventional showing that it will be irreparably injured *pendente lite* if relief is not granted. Moreover, the Court must also consider, where relevant, the possibility of harm to other interested persons from the grant or denial of the injunction, and the public interest. *Mayview Corporation v. Rodstein*, 480 F.2d 714, 717 (C.A.9, 1973); *see Eli Lilly and Co. v. Premo Pharmaceutical Labs.*, 630 F.2d 120, 136 (C.A.3), *cert. denied*, 449 U.S. 1015, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980); *Constructors Ass'n of Western Pennsylvania v. Kreps*, 573 F.2d 811, 814–15 (C.A.3, 1978).

### A. Validity of the 437 Patent

█ Because Rohm & Haas has stipulated that the 437 patent, if valid, has been infringed by Blazer, the Court need not linger on the question of infringement but must address solely the likely validity of the 437 patent. Generally, the validity of a patent is established "beyond question" where: (1) the patent has been the subject of long-standing public acquiescence in which other members of the industry have failed to contest its validity or to infringe the patent, presumably because they have concluded that such actions would prove fruitless, *see Eli Lilly and Co. v. Premo Pharmaceutical Labs.*, *supra*, 630 F.2d at 120, 136 n. 73; *Mayview Corp. v. Rodstein Corp.*, *supra*, 480 F.2d at 717; *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 871 (C.A.2, 1971), *cert. denied*, 412 U.S. 929, 93 S.Ct. 2573, 37 L.Ed.2d 156 (1973); (2) the patent has previously been adjudicated valid, *see Mayview Corp. v. Rodstein*, *supra*, 480 F.2d at 717; or (3) the patent is supported by clear and convincing technical evidence of validity, *see Eli Lilly and Co. v. Premo Pharmaceutical Labs.*, *supra*, 630 F.2d at 136 n.73; *Jenn-Air Corp. v. Modern Maid Co.*, *supra*, 499 F.Supp. at 323. Clearly, there has been no public acquiescence in the validity of the 437 patent since the underlying herbicide, Tackle, has not yet been manufactured and placed on the market for public sale in the United States and the herbicide manufacturing industry cannot be said to have conceded validity. *See Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, *supra*, 443 F.2d at 872; 8 Walker on Patents, § 689 at 422 (Deller 2d ed. 1973). Mobil contends, nonetheless, that the recently completed reissue proceeding in the PTO was tantamount to a prior adjudication of validity and that the patent is supported by sufficient technical evidence to make Mobil's chances of ultimately prevailing on the merits virtually certain. The Court is not persuaded by either argument.

### 1. Prior Adjudication

The Court agrees that a prior adjudication of patent validity need not necessarily be made by a judicial tribunal and that, theoretically at least, a PTO reissue determination could provide a sufficient foundation for presuming validity for purposes of a preliminary injunction motion if certain conditions were met. For example, if a reissue proceeding contained the full panoply of procedural safeguards incident to a judicial proceeding and afforded all interested parties a full and fair opportunity to litigate any disputed issues, a decision affirming the validity of a patent might conceivably be entitled to some deference on a motion for a preliminary injunction. Under current PTO regulations, however, an ordinary reissue proceeding is by its very nature essentially ex parte, *see PIC Inc. v. Prescon Corp.*, 485 F.Supp. 1302 (D.Del. 1980), and the determination arising from that proceeding, therefore, cannot be accorded substantial weight.

A reissue proceeding affords patent owners an opportunity to obtain a ruling from the PTO on the pertinence of prior art or other information not brought to the PTO's attention at the time the patent was originally issued. 42 Fed.Reg. 5588 (Jan. 28, 1977). A patentee may file an application for reissue if he believes his patent is valid over the prior art not previously considered, but nonetheless desires a reexamination by the PTO. *Id.* If a reissue application is filed with no changes in the specification or

claims of the patent and the PTO Examiner finds the claims patentable over the alleged prior art, the application will be rejected as lacking statutory basis for reissue. *Id.*

A reissue proceeding may be initiated only by the holder of the patent, 37 C.F.R. § 1.172, and a party desiring to contest the validity of the patent is assured of only limited participation as a "protestor." 37 C.F.R. § 1.291. A protestor initially may file with the Examiner any papers or documents which rebut the assertions made by the patentee in the reissue application, including citations of prior art and information relating thereto. 37 C.F.R. § 1.291; 42 Fed.Reg. 5589 (Jan. 28, 1977). The protestor may also continue to monitor the reissue proceeding and file such additional papers as it deems appropriate. Guidelines Relating to Reissue Proceedings adopted November 13, 1978, 977 Official Gazette 9, 11 (1978). Further protestor participation, however, is largely left to the discretion of the PTO. The protestor does not have the right to receive copies of either PTO actions taken during the course of the reissue proceeding or other official documents and the disposition of requests to receive these materials is "within the sole discretion of, and for the convenience of, the [PTO]." *Id.* Similarly, if an Examiner feels that a protestor may contribute significantly to the examination process, he may afford the protestor the opportunity to comment on materials submitted by the reissue applicant in response to PTO actions. *Id.* Comments may be solicited, however, only with the approval of a Supervisory Primary Examiner. *Id.* Finally, the protestor may not generally participate in interviews between the patent Examiner and the reissue applicant unless the PTO determines that "special justifying circumstances exist." *Id.* A protestor may not under any circumstances meet with the Examiner without the presence of the reissue applicant, and may not communicate orally with the Examiner without prior authorization from the Assistant Commissioner of Patents, except to ask purely procedural questions which do not bear on the substance of the protest or the merits of the application. *Id.*

The decision of the PTO Examiner is rendered without the benefit of an adjudicative hearing. Neither the reissue applicant nor the protestor are permitted to present live witnesses or to engage in cross-examination of the adverse party's witnesses. In addition, no opportunity for discovery is provided in PTO proceedings. The Examiner's ruling, thus, is based solely on a "paper record" without the benefit of complete adversary testing of the pertinent underlying facts. *See PIC Inc. v. Prescon Corp., supra,* 485 F.Supp. at 1310.

Once an Examiner finally rejects a reissue application as lacking statutory basis for reissue, the sole recourse available to a protestor is to file a petition for review with the Commissioner of Patents under 37 C.F.R. § 1.181. The Commissioner, or his delegate, may set aside the Examiner's ruling only if it contains a "clear error or abuse of discretion." Manual of Patent Examining Procedure § 1906. In contrast, a reissue applicant dissatisfied with an Examiner's ruling has two further tiers of review in which to seek a favorable decision: (1) he may appeal an adverse decision of the Examiner to the Board of Appeals of the PTO; and (2) if the decision of the Examiner is sustained by the Board, the applicant may seek further review in the United States Court of Customs and Patent Appeals, or file a civil suit in district court to overturn the PTO decision. 35 U.S.C. §§ 134, 141, 145; 37 C.F.R. §§ 1.301, 1.303.

In *PIC Inc. v. Prescon Corp., supra,* after carefully reviewing the foregoing examining procedures, Judge Schwartz concluded that the reissue proceedings created a "procedural imbalance between the patentee and the protestor," and ruled that a PTO decision affirming the validity of a patent, therefore, could not be given collateral estoppel effect in a court suit challenging the same patent. 485 F.Supp. at 1310. While the court conceded that no one procedural safeguard was dispositive of this finding, it cited as critical factors the lack of opportunity to examine and cross-examine witnesses at a hearing and to conduct dis-

covery, and the absence of any real opportunity for the protestor to appeal an adverse decision of the Examiner. *Id.* at 1311. The court's reasoning in *PIC* is equally applicable to the present situation where a party seeks to establish "beyond question" the validity of a patent based solely on a prior favorable determination in a reissue proceeding. The deference typically accorded to a "prior adjudication of validity" on a motion for a preliminary injunction stems largely from the presumption that the adjudication "stimulat[ed] a vigorous search of the art and a severe test of the invention." *Rosenberg v. Groov-Pin Corp.,* 81 F.2d 46, 48 (C.A.2, 1936). This presumption is reliable, however, only when the adjudication afforded both the patentee and any challenging party an adequate opportunity to litigate controverted issues because it is not uncommon "to find that all the important references [of prior art] are turned up for the first time by the industry of [an adverse party] whose interest animates his search." *Id.* at 47. Because a protestor in a reissue proceeding is at a distinct procedural disadvantage and is not able to litigate effectively disputed issues, a decision resulting from that proceeding cannot, therefore, be considered a "prior adjudication."

Although Mobil concedes that a reissue proceeding is technically ex parte, it argues, however, that most of the procedural deficiencies ordinarily present in such proceedings were eliminated in this case and that the refusal to reissue the 437 patent was analogous to a prior adjudication of validity. Specifically, Mobil claims that Rohm & Haas: (1) received copies of all papers issued or filed in the reissue proceeding; (2) was allowed to participate at all interviews between Mobil and PTO personnel; and (3) conducted extensive discovery regarding the validity of the 437 patent, including deposing Dr. Robert J. Theissen, the alleged inventor of the patent. In addition, Mobil claims that Rohm & Haas raised every conceivable ground of invalidity before the PTO and that these challenges were "considered, reconsidered and repeatedly rejected." (D.I. 40 at 29.)

■ Although these supplemental procedural safeguards admittedly strengthened the accuracy of the PTO reissue determination, the Court finds that they did not sufficiently cure the procedural imbalance existing between Mobil and Rohm & Haas to justify deferring to the judgment of the PTO. At least two critical procedural elements—the opportunity to present live testimony and to cross-examine witnesses before the Examiner, and the right of the protestor to appeal an adverse decision—still were missing from the Mobil reissue proceeding and these factors in and of themselves deprived Rohm & Haas of an adequate opportunity to contest fully the validity of the 437 patent. Accordingly, the Court finds that the Mobil reissue proceeding which resulted in a refusal to reissue the 437 patent was not tantamount to a prior adjudication of validity and did not establish the validity of the patent "beyond question."

### 2. *Technical Evidence of Validity*

■ Mobil argues in the alternative that its 437 patent is supported by sufficient technical evidence of validity to support a preliminary injunction. Although the 437 patent may well survive a trial on the merits, the Court cannot conclude on the existing record that Mobil has met its heavy burden of demonstrating validity by clear and convincing technical evidence.

At the outset, due consideration must be made of the difficulties engendered by an analysis of the technical evidence underlying the 437 patent. The Court is not schooled in the nomenclature or principles of chemistry upon which an understanding of the complex issues in this case rests. Accordingly, without the assistance of expert testimony and a full hearing amounting to a mini-trial on the merits, it is virtually impossible to evaluate independently the validity of the 437 patent. *Zenith Laboratories, Inc. v. Eli Lilly & Co.,* 460 F.Supp. 812, 823 (D.N.J.1978).

■ Those materials which have been presented to the Court, however, have

raised sufficient doubts about the adequacy of the disclosure underlying the 437 patent application to foreclose a grant of preliminary injunctive relief. Under the requirements of 35 U.S.C. § 112, a patent application must set forth clearly the scope and limits of the invention. *Standard Oil Co. v. Montedison*, 664 F.2d 356, 363 (C.A.3, 1981). The specification must convey to those skilled in the art the particular dimensions of the invention with a reasonable degree of precision and clarity so as to insure that the applicant actually invented the subject matter claimed. *Application of Wertheim*, 541 F.2d 257, 262 (C.C.P.A.1976); 2 Chisum, Patents § 7.04 at 7–52 (1981). The importance of adequate disclosure is highlighted, moreover, in situations such as this where a patent applicant claims entitlement to the filing date of an earlier application under 35 U.S.C. § 120, thus preempting intervening research by a competitor. Satisfaction of the description requirement insures that claims presented subsequent to the original application, as part of an alleged "continuation," are actually within the subject matter disclosed by the original application and thus fairly entitled to this earlier filing date. *Application of Smith*, 481 F.2d 910, 914 (C.C.P.A.1973); 2 Chisum, Patents § 7.04 at 7–51 (1981).

The specification of the 437 patent application and its 1971 predecessor disclose a broad generic formula which, when certain chemical substituents are taken in various combinations, encompasses the Blazer compounds contained in Claim One of the 437 patent. While continuation patent applications may contain claims which are subgeneric to the original specification, *see e.g. Application of Herschler*, 591 F.2d 693 (C.C.P.A.1979); *Application of Driscoll*, 562 F.2d 1245 (C.C.P.A.1977); *Snitzer v. Etzel*, 465 F.2d 899 (C.C.P.A.1972), where a broadly worded specification covers myriads of possible chemical agents without some guide as to particular preferred selections, the courts have found the disclosure to be inadequate and have rejected the continuation application. *Hercules Inc. v. Exxon Corp.*, 497 F.Supp. 661, 686 (D.Del.1980); *Application*

*of Ruschig*, 379 F.2d 990, 995 (C.C.P.A. 1967). *See also Standard Oil Co. v. Montedison*, 494 F.Supp. 370, 409 (D.Del.1980), aff'd, 664 F.2d 356 (C.A.3, 1981); Gholz, *Recent Developments in the CCPA Relating to the First Paragraph of 35 U.S.C. 112*, 54 J.Pat.Off.Soc'y 768, 787–88 (1972); 2 Chisum, Patents § 7.04 at 7–58 to 62. An independent review of the 437 patent application, which embraces virtually millions of potential compounds, leads the Court to believe that Mobil's application may well fall into this latter category of cases. The Court, of course, expresses no view on the eventual outcome of this suit; it cannot at this time, however, determine that the validity of the 437 patent has been established by clear and convincing technical evidence sufficient to grant a preliminary injunction.

**B.** *Irreparable Injury*

■ Even if Mobil had sufficiently demonstrated the validity of its patent to satisfy the first requisite for injunctive relief, the Court would decline to issue the injunction for the simple reason that no showing of irreparable injury has been made. The grant of preliminary injunctive relief serves one narrow purpose: it "minimize[s] the probable harm to legally protected interests between the time that the motion ... is filed and the time of the final hearing." *Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 814–15 (C.A.3, 1978). Although a proper consideration of the merits of the motion entails a "delicate balancing" of all four factors described previously, the courts have rarely, if ever, found such interim relief necessary without a substantial showing that the movant will suffer irreparable harm without judicial intervention. *See A. O. Smith Corp. v. F.T.C.*, 530 F.2d 515, 525 (C.A.3, 1976); *National Land & Investment Co. v. Specter*, 428 F.2d 91, 97 (C.A.3, 1970); *Gerity v. Cable Funding Corp.*, 372 F.Supp. 679, 683 (D.Del.1973).

Mobil's claims of irreparable injury are simply non-existent. Mobil's patented herbicide, Tackle, is still in the experimental

stage and Mobil only recently received authorization from the EPA to test Tackle on soybean test sites located in this country. Although it is likely that Tackle will eventually receive permanent EPA approval, because it is not now marketed and may not be fully commercialized in the United States for several years, Mobil is in possession of no legal interest which is in need of *pendente lite* protection by this Court.[5] In fact, little would be gained by Mobil if the injunction were granted other than a psychological edge in this litigation, and a superior bargaining chip for settlement negotiations. In contrast, the removal of Blazer from the market pending a final decision on the merits would have a substantial negative impact on Rohm & Haas, creating possibly millions of dollars in lost profits and severe dislocation in the operation and management of the company.

Moreover, even if Mobil were to demonstrate some concrete injury stemming from the continued sale of Blazer or to receive permission from the EPA to market Tackle while this suit is still pending, it has still not demonstrated that it cannot be adequately compensated for its losses once this case has been finally decided. In order to be irreparable, the injury suffered "must be of a peculiar nature, so that compensation in money cannot atone for it." *A. O. Smith Corp. v. F.T.C., supra*, 530 F.2d at 525. Although irreparable injury may be found where monetary damages are difficult to ascertain or are inadequate, *id.*, Mobil has not made such a showing here. All that might possibly be lost without injunctive relief is profits and the Court does not perceive any great difficulty in calculating the extent of the compensation due, should that become necessary.

There is also no question that Rohm & Haas would be able to pay any damages which might be assessed. Rohm & Haas' net sales in 1980 were well in excess of 1.5 billion dollars and its net earnings exceeded 90 million dollars. Its current assets, working capital and shareholders' equity are also substantial. (D.I. 62, Exhibit A at 2.) As this Court has recently noted, where an alleged infringer is sufficiently solvent to meet any potential recovery, irreparable injury will rarely be found. *Jenn-Air Corp. v. Modern Maid Co., supra*, 499 F.Supp. at 333. There is no justifiable reason for departing from this elementary principle in this case.

Mobil has made a number of highly speculative and in some cases irreconcilable arguments in an attempt to meet its burden of demonstrating incalculable loss. First, Mobil argues that once a farmer is satisfied with a particular product, he is unlikely to change to a different brand of the same or similar chemical. (D.I. 40 at 25.) Even if this argument has a basis in fact, the Court cannot discern its relevance. If Mobil prevails at trial, subsequent sales of Blazer will be enjoined and Tackle will be the only herbicide on the market simulating Blazer's product chemistry. If Tackle receives EPA approval before a trial on the merits, both products may occupy the market at the same time and Blazer may well exceed Tackle in sales while this proceeding is pending. This factor, however, would only affect the amount of damages recovered by Mobil and would not alter Mobil's ability to actually recoup any losses it may incur as a result of competition from Blazer. Thus this argument cannot support a claim of irreparable injury.

Mobil alternatively argues that if Blazer is successfully marketed and applied in soybean farming operations, the weeds which it is designed to control will eventually develop a resistance to the herbicide. Consequently, by the time Tackle, which has the same active ingredient as Blazer, reaches the United States market, it will be ineffective. (D.I. 69 at 33–34.) While there is some scientific support for the proposition that weeds may develop over time some tolerance for post-emergence herbicides (D.I. 64, Exhibit XIII at 83–85, 136–38), there are no documented cases of this phe-

---

5. By its own estimates, Mobil concedes that full registration of Tackle may not be granted until as late as 1984. (D.I. 64, Ex. IX.)

nomenon occurring either to a diphenyl ether herbicide or in soybean farming operations in general. (*Id.*). Moreover, as Rohm & Haas correctly notes, Mobil's argument incredibly proposes that the Court grant preliminary injunctive relief to insure that the weeds presently afflicting soybean crops will be preserved for Mobil to destroy if and when Tackle receives final EPA approval. (D.I. 63 at 35.)

Finally, Mobil contends that Blazer contains a surfactant (wetting agent) and an industrial solvent not present in Tackle, which have exhibited highly toxic qualities, and as a result Mobil could have a difficult time persuading farmers to purchase Tackle. (D.I. 69 at 35–36.) This argument is likewise entirely speculative since Mobil has adduced no proof demonstrating that Blazer, which survived extensive EPA field testing, has adversely affected soybean crops or that Tackle will be so closely identified with Blazer that, despite any creative advertising efforts on Mobil's behalf, farmers will refuse to purchase the product.

The Court thus concludes that Mobil has failed to make the requisite showing of irreparable injury necessary to claim entitlement to a preliminary injunction.

## C. *Harm to Other Interested Parties and the Public Interest*

■ The Court also believes that the interests of third parties, namely, farmers who utilize Blazer, and the public interest in a healthy farming economy and adequate crop yields, would be adversely affected by the grant of preliminary injunctive relief. The widespread domestic use of Blazer and the confidence placed in that product by farmers has been well documented by Rohm & Haas. In 1980 alone, after Rohm & Haas received full EPA approval for commercial marketing of Blazer, sales of that product in the United States were approximately 23 million dollars, higher than originally predicted. (D.I. 62, Ex. A.) In 1981, sales of Blazer are estimated to approach 55 million dollars. (*Id.*).

Besides this volume of business, the importance of Blazer is reflected in the nu-

merous applications for emergency use of Blazer which have been filed with the EPA over the last few years. In 1979, before Blazer received full EPA approval for use on soybean crops, six different states, including Delaware, sought and obtained emergency exemptions from the EPA to enable soybean growers in those states to use Blazer. (D.I. 62, Ex. A, A–2.) In a joint application filed with the EPA by the states of Delaware, Maryland and Virginia, the EPA found that of the 22 or more registered herbicides then designed to control certain species of weeds in soybean fields, only Blazer would be effective. (D.I. 62, Ex. A–2.) Similar findings were made by the EPA in the other three emergency applications. (*Id.*). As a result of these emergency exemptions, permission was given to use Blazer on approximately 800,000 acres of soybeans with an aggregate projected savings to local farmers of 29 million dollars. (*Id.*).

Since April, 1980, when Blazer received full EPA authorization for use in soybean fields, it has also received emergency exemptions from the EPA for application to other crops. In 1980, the state of Mississippi successfully petitioned the EPA to permit farmers in that state to apply Blazer to 50,000 acres of rice to control outbreaks of certain problem weeds which would have cost local farmers over 4 million dollars. (D.I. 62, Ex. A, A–4.) In 1981, both Mississippi and Arkansas received EPA approval to allow rice farmers to apply Blazer to an additional 150,000 acres to avoid 7 million dollars in losses. (D.I. 62, Ex. A, A–5.) And in March, 1981, the state of Oklahoma similarly petitioned the EPA for an emergency use permit to apply Blazer to 14,000 acres of peanuts to avoid losses of 1.6 million dollars. (*Id.*). This application also apparently received favorable consideration. (D.I. 88 at 29.) In all of these applications, the petitioning states successfully argued that existing registered herbicides would not effectively control the virulent weed growth expected to infest their crops.

Faced with this undisputed data, Mobil concedes that other herbicides "do not pos-

sess the same broad spectrum of activity exhibited by 'Blazer' and, therefore, have a much more limited market potential . . . ." (D.I. 69 at 40.) Nonetheless, Mobil argues that only three or four major problem weeds confront a particular soybean farmer at any given time and that there are at least 14 alternative herbicides presently available to control such weed growth. (*Id.*; D.I. 69A, Ex. B at 58–62, 67–68, 124–25.) In addition, despite the fact that Blazer received emergency exemptions from the EPA on at least three occasions in the most recent growing season for rice and peanuts, Mobil argues that it is not likely that these emergencies will recur. (D.I. 69 at 40.) If they do, Mobil contends that emergency use permits can easily be obtained for Tackle instead of Blazer. (*Id.* at 40–41.)

The Court is not persuaded by these arguments. Because the development of a commercial herbicide encompasses several years, many, if not all, of Mobil's alleged alternative herbicides must have been either fully commercialized or available for emergency use in the period from 1979–81. Yet, the EPA officials supervising pesticide programs, the individual departments of agriculture situated in the petitioning states and the agricultural experts advising those state authorities all concluded that Blazer alone could alleviate the anticipated problems with weed growth in those localities. In addition, Mobil's arguments also overlook the fact that its fourteen herbicides have been used to control weed growth only in soybean acreage; no evidence has been brought to the Court's attention that these herbicides, like Blazer, have been utilized on an emergency basis in either rice or peanut fields. Finally, enjoining further sales of Blazer, which has proven to be a successful weapon in containing the growth of weeds, would either deprive American farmers of any herbicide containing Blazer's active ingredient while this suit is pending, or force the EPA to short-circuit its own testing procedures and prematurely authorize Tackle for application on soybeans and other crops, as needed. Neither result would be in the best interests of farmers or the consuming public of this country.

The Court thus concludes that the harm both to third parties and to the public resulting from the withdrawal of Blazer from the market likewise compels the Court to deny Mobil's motion for preliminary injunctive relief.

## II. *Motion to Consolidate*

Rohm & Haas has moved the Court to consolidate C.A. No. 78–384 ("1978 action"), the declaratory judgment action challenging the validity of the 437 patent, with C.A. No. 79–397 ("1979 action"), an action in which Mobil charges Rohm & Haas with infringement of three other Mobil patents which also embrace certain of the Blazer compounds. (Mobil Patents Nos. 4,164,408; 4,164,409; and 4,164,410 ["408", "409", and "410" patents].) In this latter suit, Rohm & Haas has filed a counterclaim, contending that Mobil's manufacture of Tackle in turn infringes two of Rohm & Haas' existing patents. (Rohm & Haas Patents Nos. 3,928,416 and 4,063,929 ["416" and "929" patents].) Mobil opposes the motion for consolidation.

Under Rule 42(a), F.R.Civ.P., separate actions involving common questions of law or fact may, in the discretion of the Court, be consolidated for trial. *Shump v. Balka*, 574 F.2d 1341, 1344 (C.A.10, 1978); *In Re Air Crash Disaster*, 549 F.2d 1006, 1013 (C.A.5, 1977); *La Chemise La Coste v. Alligator Co., Inc.*, 60 F.R.D. 164, 175 (D.Del.1973). Although such common issues are a prerequisite to consolidation, the mere existence of these issues does not require a joint trial as a matter of course. Instead the Court must balance the savings of time and effort gained through consolidation against the inconvenience, delay or expense that might result from simultaneous disposition of the separate actions. *Continental Bank & Trust Co. v. Platzer*, 304 F.Supp. 228, 229–30 (S.D.Tex.1969); 9 Wright & Miller, Federal Practice and Procedure: Civil § 2383 at 259–60.

It is undisputed that the two civil actions at issue involve common questions of law and fact. All of the six patents underlying

the two suits are directed toward different Blazer compounds and the claims of several of these patents overlap.[6] Moreover, Mobil's patents all can be traced to a common disclosure, the 1971 specification, and the validity of these patents may depend in large part on the Court's ruling as to the adequacy of that specification. Conversely, whether Rohm & Haas can claim inventorship of the Blazer compounds, and thus support the validity of its patents, will depend to some extent on the appropriate filing date of the 437 patent, as determined by the Court.

Mobil principally argues, however, that the 1978 and 1979 actions are at different stages of preparation and that consolidation will unnecessarily delay an early trial of the 1978 suit. The five patents involved in the 1979 action are all presently the subjects of reissue proceedings in the PTO and the completion of those proceedings could arguably take several years, thus precluding a joint trial on the merits during that time period if consolidation is ordered. In contrast, the 437 patent has successfully completed the reissue process and the issues raised by that patent are said to be ready for trial. Thus, Mobil contends that the delay, prejudice and inconvenience resulting from consolidation will outweigh any savings of judicial time and effort which may occur.

Although the Court is well aware of the protracted nature of the 1978 action and is sensitive to Mobil's ostensible desire for expeditious resolution of this controversy, it believes that consolidation will appreciably serve the interests of judicial economy for several reasons. First, there is no indication that the 1978 action will soon be ready for trial. No discovery cut-off date has been set and at the time that the motion to consolidate was filed in July, 1981, Rohm & Haas had noticed at least eight additional depositions. (D.I. 79 at 12.)

Second, the questions to be decided in both suits are highly technical and closely intertwined. There is little logic in forcing the Court to educate itself on the intricate factual details and complex legal issues common to both suits on two occasions, in preparation for two separate trials. Third, both cases will undoubtedly involve a large number of the same witnesses, and the same documentary evidence and exhibits, thus raising the specter of inefficient and wasteful duplication. Finally, it is not clear that the outstanding reissue proceedings concerning the patents involved in the 1979 action are inordinately far from completion. The proceedings concerning Rohm & Haas' 416 and 929 patents apparently will be concluded in the near future (D.I. 79 at 12), and Mobil has requested expedited consideration of its remaining reissue applications. (D.I. 76 at 17.) In any event, the Court is satisfied that any delay occasioned by consolidation is substantially outweighed by the benefits of a single trial.

*Conclusion*

For the reasons discussed in this opinion, the Court concludes that Mobil's motion for a preliminary injunction will be denied and that Rohm & Haas' motion to consolidate C.A. No. 78–384 with C.A. No. 79–397 will be granted.

An order will be entered in accordance with this opinion.

---

**6.** Claim One of Mobil's 437 patent embraces the acid form and certain esters of the Blazer compounds. Mobil's 409 patent essentially claims the same acid as the 437 patent, while the 410 patent claims the same esters as the 437 patent. In addition, Rohm & Haas' 416 patent likewise is directed at the acid Blazer form and certain esters of Blazer, and both the 408 patent and the 929 patent cover certain of the Blazer salts, including the active ingredient of Blazer itself. (D.I. 79 at 2.)